MOTHER & UNBORN BABY CARE
OF NORTH TEXAS, INC., and
Charles J. Pelletier, II, Appellants,

v.

The STATE of Texas, Appellee.

No. 2–86–266–CV.

Court of Appeals of Texas,
Fort Worth.

March 30, 1988.

Rehearing Denied May 11, 1988.

Cantey, Hanger, Gooch, Munn & Collins and Richard L. Griffith, Gandy, Michener, Swindle, Whitaker & Pratt and J. Shelby Sharpe, Fort Worth, for appellants.

Jim Mattox, Atty. Gen., Mary F. Keller, Executive Asst., David A. Talbot, Jr., Sp. Asst., and H. Clyde Farrell, Stephen Gardner, and Eliot D. Shavin, Asst. Attys. Gen., Dallas, for appellee.

Brender, Casey and Colosi and Art Brender, Fort Worth, amicus curiae brief of The Greater Fort Worth Chapter of The American Civil Liberties Union.

B.C. Cornish, Fort Worth, brief of amicus, Jane Doe.

Before HILL, LATTIMORE and BURDOCK, JJ.

## OPINION

LATTIMORE, Justice.

Appellants, Mother & Unborn Baby Care of North Texas, Inc. ("Center") and Charles J. Pelletier, II ("Pelletier"), brings this appeal from a judgment enjoining certain conduct found in violation of the Deceptive Trade Practices—Consumer Protection Act ("DTPA"); the court further mandated disclosure in advertising, assessed civil penalties for violations of the DTPA and further violation of a court-ordered temporary injunction, and awarded attorney's fees to the State. *See* TEX.BUS. & COM.CODE ANN. secs. 17.41–17.50 (Vernon 1987).

Appellants bring ten points of error alleging: improper interpretation and application of the DTPA; lack of reasonable notice; violation of their right to freedom of speech, press and religion; an inalienable right to disseminate information and, improper exclusion of evidence or, in the alternative, insufficiency of evidence to assess penalties against appellant, Charles Pelletier, II.

The judgment is affirmed.

The present case deals with the propriety of methods of advertising by appellants.

Evidence adduced at trial showed the following approximate sequence of events: a large number of women found appellants' advertisement within the Southwestern Bell Yellow Pages ("Yellow Pages"); believing it to be an abortion clinic, the women contacted the Center requesting an abortion. Through different means, either asking different questions or giving evasive answers, these women were led to believe that the Center was an abortion clinic, and made an appointment. Upon their arrival, the women gave personal medical information to appellants' volunteers by filling out a medical information card. They then gave appellants urine samples to obtain free pregnancy tests, as advertised. Upon being told, both over the phone and in person, the test would take 30 minutes, the women expected to wait for the results. While waiting they were led into another room by themselves whereupon they were shown a slide show and a videotape showing graphic pictures pertaining to abortion procedures. It was generally not until the slide/video presentation was shown that the women began to suspect they were not in an abortion clinic. After the presentations, counselors including Pelletier came into the room to attempt to persuade the women against having an abortion. This was later followed up by notes and phone calls from the Center's personnel.

Appellants advertised in the Yellow Pages under the headings "Abortion Information & Services," and "Clinics—Medical." Appellants are pro-life oriented. There is contradictory evidence as to whether appellants attempted to deceive the telephone company regarding whether they actually performed abortions. In 1986, the Yellow Pages refused to allow appellants to further advertise under the above two headings, and the listing was moved to "Abortion Alternatives"; there is conflicting testimony pertaining to the placement of the 1986 advertisement which actually appears under two columns of "Abortion Services," and is twice the size of the previous advertisements. There is extensive evidence concerning a manual from the Pearson Foundation entitled, "How to Start and Operate Your Own Pro–Life Outreach Crisis Pregnancy Center," which is the primary basis of the principles upon which appellants' corporation is founded. There is conflicting evidence as to the evasive methods in which the manual and the appellants promote their purposes by attracting women seeking an abortion into appellants' "clinic"; this includes answering phone calls with evasive answers so as to imply that appellants performed abortions. The manual suggested, and appellants followed, the procedure of incorporating under the name of Mother & Unborn Baby Care of North Texas, Inc., but operated under the name Problem Pregnancy Center, d/b/a Pregnancy Problem Center, d/b/a Abortion Action Affiliates Problem Pregnancy Center. The corporate name does not appear in the Center's advertisements or on its building. Evidence is contradictory as to whether this was purposefully done to deceive potential clients into coming to the Center seeking an abortion.

Appellants' first point of error attacks the applicability of the DTPA to appellants' conduct. Section 17.46 of the Texas Business and Commerce Code provides the following:

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division under Sections 17.47, 17.58, 17.60, and 17.61 of this code.

TEX.BUS. & COM.CODE ANN. sec. 17.46 (Vernon 1987). Definitions pertinent to appellants' contentions are within section 17.45 of the code:

(1) "Goods" means tangible chattels or real property purchased or leased for use.

(2) "Services" means work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods.

. . . .

(4) "Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more.

. . . .

(6) "Trade" and "commerce" mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.

TEX.BUS. & COM.CODE ANN. sec. 17.45(1), (2), (4), and (6) (Vernon 1987).

■ Appellants first argue that their conduct does not constitute trade or commerce because they do not actually sell abortions and medical services, and therefore the DTPA does not apply.

Considering appellants' contentions, we first look to the definitions of "trade" and "commerce," which encompasses "advertising, offering for sale ... or distribution of any good or service ... or thing of value...." TEX.BUS. & COM.CODE ANN. sec. 17.45(6) (Vernon 1987). By Pelletier's own admission, advertising was sought and obtained with Southwestern Bell, the objective of which being to draw in women seeking or considering an abortion. Exhibits of

the actual advertising by appellants from 1984 through 1987 are within the record.

Appellants distributed goods in the way of pamphlets. They also distributed services in the way of pregnancy testing, anti-abortion counseling, arrangements of financial assistance, aid in adoption procedures, and help in obtaining legal aid.

Appellants next contend that they do not sell any goods or services, and therefore the DTPA does not apply to their activities. We disagree.

■ It is immaterial whether appellants provided a service in exchange for money; the statute as a whole supports the conclusion that transfer of valuable consideration is not necessary. *See Martin v. Lou Poliquin Enterprises, Inc.*, 696 S.W.2d 180, 184 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.), *overruling Bancroft v. Southwestern Bell Tel. Co.*, 616 S.W.2d 335 (Tex.Civ.App.—Houston [14th Dist.] 1981, no writ). If in the context of a transaction in goods or services, any person engages in an unconscionable course of action which adversely affects a consumer, that person is subject to liability under the DTPA. *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705, 707 (Tex.1983); TEX.BUS. & COM.CODE ANN. sec. 17.-50(b)(1) (Vernon 1987). The term "sale" is merely one of five possible definitions listed under section 17.45(6).

■ Further, there is no doubt that the women concerned are "consumers" within the definition of section 17.45(4). Each woman, an individual, testified that she was seeking to purchase a service upon which this complaint is based. *See Riverside Nat. Bank v. Lewis*, 603 S.W.2d 169, 174 (Tex.1980).

■ Appellants next argue that their activities of disseminating information fall under section 17.49 as an exemption from the DTPA; that provision relates the following:

(a) Nothing in this subchapter shall apply to the owner or employees of a regularly published newspaper, magazine, or telephone directory, or broadcast station, or billboard, wherein any advertisement in violation of this subchapter is published or disseminated, unless it is established that the owner or employees of the advertising medium have knowledge of the false, deceptive, or misleading acts or practices declared to be unlawful by this subchapter, or had a direct or substantial financial interest in the sale or distribution of the unlawfully advertised good or service. Financial interest as used in this section relates to an expectation which would be the direct result of such advertisement.

TEX.BUS. & COM.CODE ANN. sec. 17.-49(a) (Vernon 1987).

In all interpretations of the Act, the primary objective is to ascertain the legislature's intent. *Woods v. Littleton*, 554 S.W.2d 662, 666 (Tex.1977). To do that we must look to the Act as a whole, and not at its isolated provisions, keeping in mind "the old law, the evil, and the remedy." *Id.* at 665. The legislature itself stated that the Act "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." TEX.BUS. & COM. CODE ANN. sec. 17.44 (Vernon 1987).

The scope of the Act is delineated in section 17.49, which sets out the exemptions to the DTPA; those exempted encompass certain media owners and employees who publish and disseminate deceptive advertisements of goods and services for third parties.

■ Appellants are not members of the media, and are disseminating information for themselves. It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose. *Eddins–Walcher Butane Company v. Calvert*, 156 Tex. 587, 298 S.W.2d 93, 96 (1957). In furtherance of this doctrine, we believe every word excluded from a statute must be presumed to have been excluded for a purpose. Only when necessity requires, will we insert ad-

ditional words or requirements into a statutory provision, in order to give effect to clear legislative intent. *See Mauzy v. Legislative Redistricting Board*, 471 S.W.2d 570, 572 (Tex.1971). By exempting appellants from the provisions of the Act, we would be lending credence to those whom the legislature intended to be subject to this law. Had the legislature intended for appellants to be exempted from this Act, it could have easily done so by simply drafting an additional exemption into the appropriate provision. *See Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981). We find no indication that the legislature intended appellants' argument to be a persuasive one.

■ Finally, even if appellants were initially exempted, section 17.49(a) withdraws the exemption if "it is established that the owner or employees of the advertising medium have knowledge of the false, deceptive, or misleading acts or practices declared to be unlawful by this subchapter." TEX.BUS. & COM.CODE ANN. sec. 17.-49(a) (Vernon 1987).

Charles Pelletier testified that in 1984 he contacted Mr. Toy Echols, an advertising representative of Southwestern Bell, in order to place an ad in the phone directory. Pelletier initiated the contract with Southwestern Bell, and submitted the advertisement he wanted placed in the Yellow Pages. He further submitted advertisements for 1985–1986 for the Center. Pelletier testified that he specified the headings he wanted the Center to appear under; he was personally responsible for the size of the advertisement, which doubled in the 1986 directory. The reason for the enlargement of the ad in 1986 was Southwestern Bell's refusal to allow appellants to further advertise under Medical Clinics and Abortion Services. We find that appellants had knowledge of the improper advertising.

The jury found fraud and false, misleading, or deceptive acts or practices by Pelletier through the Center. Upon reviewing the record, the evidence is sufficient to support these findings, thus removing appellants from any alleged exemption under the DTPA.

■ Finally, appellants rely on section 17.46(c)(1) which states the following:

(c)(1) It is the intent of the legislature that in construing Subsection (a) of this section in suits brought under Section 17.47 of this subchapter the courts *to the extent possible* will be guided by Subsection (b) of this section and the interpretations given by the Federal Trade Commission and federal courts to Section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C.A. sec. 45(a)(1)].

TEX.BUS. & COM.CODE ANN. sec. 17.-46(c)(1) (Vernon 1987) (emphasis added).

Appellants refer us to two federal cases to support their contentions.

Appellants direct us to *Community Blood Bank of Kansas City Area, Inc. v. F.T.C.*, 405 F.2d 1011, 1022 (8th Cir.1969), to support their contention that since they do not operate their business for a profit, the DTPA does not apply to their activities. *Community Blood Bank* superficially supports appellants' position; the blood bank, because of its belief that commercial dealing in human blood was immoral, pursued a planned course in restraint of trade of the commercial blood banks. The opinion protects Community because it is a non-profit charitable corporation. Non-profit corporations are specifically exempted from 15 U.S.C.A. sec. 45 (West Supp.1988). Here, the DTPA makes no such exception. It is not a question of interpretations of the federal courts being set aside, it is a matter of application of the Texas Act. *See Farmers & Merchants, Etc. v. Ferguson*, 605 S.W.2d 320, 325 (Tex.Civ.App.—Fort Worth 1980, no writ).

Appellants further rely on *State of Mo. v. Nat. Organization for Women*, 620 F.2d 1301 (8th Cir.1980). N.O.W. organized an effective economic boycott of states whose legislatures did not ratify the Equal Rights Amendment to the United States Constitution. The Eighth Circuit held that Congress did not intend for the antitrust act to apply to the political and social activities of N.O.W. *Id.* at 1302. We decline to equate the politically persuasive power of N.O.

W.'s boycott with individually persuasive power of appellants' false and deceptive advertising.

■ Appellants are attempting to utilize certain federal cases as persuasive theories which are not within the DTPA. Congress amended the Federal Trade Commission Act, section 5(a)(1), now 15 U.S.C.A. sec. 45(a)(1) authorizing the FTC to prohibit unfair or deceptive trade practices. However, state regulations will be supplanted only when they are inadequate or counterproductive to the commission's regulations. *American Financial Services v. F.T.C.,* 767 F.2d 957, 990 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1011, 106 S.Ct. 1185, 89 L.Ed.2d 301 (1986).

We find that the DTPA applies to appellants and their activities in question. Appellants' first point of error is overruled.

By their second and third points of error, appellants allege that the DTPA as applied to appellants violates the due process clause of the fourteenth amendment and article I, sections 10 and 19 of the Texas Constitution because the DTPA is vague and overbroad. We disagree.

The overbreadth doctrine is founded on the principle that "a governmental purpose to control or prevent activities constitutionally subject to regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." *N.A.A.C.P. v. Alabama,* 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L.Ed.2d 325 (1964); *Gholson v. State,* 667 S.W.2d 168, 172 (Tex.App.—Houston [14th Dist.] 1983, pet. ref'd).

■ In a facial challenge to overbreadth and vagueness of a statute, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct, if it does not, then the overbreadth challenge must fail. *See Village of Hoffman Est. v. Flipside Hoffman Est.,* 455 U.S. 489, 494, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362, (1982). The court should then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should

uphold the challenge only if the enactment is impermissibly vague in all of its applications. *Id.*; *Al-Omari v. State,* 673 S.W.2d 892, 897 (Tex.App.—Beaumont 1983, no writ).

■ In Texas courts, an overbreadth challenge is predicated on how the enactment is applied to the accused. *McDonald v. State,* 693 S.W.2d 660, 662 (Tex.App.—Dallas 1985, no writ); *Gholson,* 667 S.W.2d at 173. The record reveals that the DTPA was not applied to appellants specifically to penalize any speech or conduct protected by the first amendment. The statute prohibits false statements or advertisements to protect the public; it does not prohibit the specific content as advertised. "Untruthful speech, commercial or otherwise, had never been protected for its own sake." *Friedman v. Rogers,* 440 U.S. 1, 9, 99 S.Ct. 887, 894, 59 L.Ed.2d 100 (1978) *citing Gertz v. Welch, Inc.,* 418 U.S. 323, 340, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). The DTPA proscribes activities constitutionally forbidden, but does not further encompass protected speech or conduct. *See Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

■ Turning to the allegation that the DTPA is void for vagueness, the standard rule is that a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess as to its meaning and differ as to its application, lacks the first essential of due process of law. *Connally v. General Const. Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *Lone Star Gas Co. v. Kelly,* 140 Tex. 15, 165 S.W.2d 446, 448 (Tex.Comm.App.1942, opinion adopted). A statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that his comtemplated conduct is forbidden by the statute. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972); *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811, 98 L.Ed.2d 989 (1954). Greater leeway is allowed in applying the fair notice test when a court considers allegations of vagueness and indefiniteness in "regulatory statutes gov-

erning business activities." *Papachristou,* 405 U.S. at 162, 92 S.Ct. at 843; *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex. 1980). The court initially presumes the law is constitutional and places the burden upon the person attacking the law's validity to prove otherwise. *See Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983); *see also Robinson v. Hill,* 507 S.W.2d 521, 524 (Tex. 1974).

■■■ The analysis of "vagueness" in cases involving regulatory statutes governing business activities is different from the approach to cases arising under the first amendment; in the latter cases, the court is concerned with the issue of whether the statute is vague "on its face," since the vagueness may itself deter constitutionally protected conduct. *United States v. National Dairy Products Corp.,* 372 U.S. 29, 36, 83 S.Ct. 594, 599, 9 L.Ed.2d 561 (1963); *Huett v. State,* 672 S.W.2d 533, 537 (Tex. App.—Dallas 1984, writ ref'd). A facial challenge, in this context, means a claim that the law is completely invalid, and therefore incapable of any valid application. *Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). A facial challenge to a statute for vagueness is only appropriate upon an allegation that the law is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971); *Smith v. Smith,* 720 S.W.2d 586, 598 (Tex. App.—Houston [1st Dist.] 1986, no writ).

■■■ Appellants' approach to their vagueness allegation is misplaced, because the vagueness doctrine is not analyzed "as applied" to appellants. Even so, we will address the issue as to whether the DTPA is facially vague.

■■■ Section 17.46 declares "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" unlawful. TEX.BUS. & COM.CODE ANN. sec. 17.46(a) (Vernon 1987). This is followed by subsection (b)(1–24) listing specific acts which are deceptive under the DTPA. Appellants were found guilty by a jury of violating sections 17.46(b)(1), (2), (5), and (9), which list the following acts or practices as false, misleading or deceptive:

(1) passing off goods or services as those of another;

(2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

. . . .

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

. . . .

(9) advertising goods or services with intent not to sell them as advertised;

TEX.BUS. & COM.CODE ANN. sec. 17.-46(b)(1), (2), (5), and (9) (Vernon 1987). Further, section 17.45 specifically defines all necessary terms which are used within the statute prohibiting specific acts.

In applying the fair notice test, we hold that the DTPA is constitutional and not impermissibly vague in all of its applications. Appellants' second and third points of error are overruled.

■■ By their fourth point of error, appellants argue that application of the DTPA to their conduct violates their right of freedom of speech as protected by the first and fourteenth amendments, and by the Texas Constitution, article I, section 8, as against state intrusion. Appellants rely on *Federal Election Com'n v. Mass. Citizens For Life, Inc.,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) to support their contention that, as a non-profit organization disseminating pro-life information, application of the DTPA to their activities violates their freedom of speech. We do not find this argument persuasive.

The obvious similarity between the *Massachusetts* case and the case at bar lies in the pro-life purpose, non-profit, non-stock corporations of both. There the similarities end. Massachusetts Citizens For Life

("MCFL") published a regular newsletter, distributed to contributors and non-contributors who expressed support for their political views. *Massachusetts*, 107 S.Ct. at 617. In preparation for upcoming primary elections, MCFL distributed a "Special Election Edition" listing some 400 candidates, but with only 13 photographs of those the group supported. *Id.* The special edition was financed from its general treasury funds. *Id.* The Court determined that section 316 of the Federal Election Campaign Act ("FECA"), pertaining to expenditures of funds from corporate treasuries being utilized on behalf of political candidates, was in violation of the first amendment as applied to MCFL. *Id.* at 618. The court found that the statute was too substantial a restriction upon speech; the requirements which applied to those companies who were incorporated were too burdensome, and might deter some groups from participating in any political activity. *Id.* at 626. The court found that the restrictions should have been more narrowly tailored; finally, MCFL did not pose a threat of unfair deployment of wealth for political purposes with corporate funds, the primary infraction that the FECA was promulgated to guard against. *Id.* at 630.

While *Massachusetts* concerns pure, classic speech, the case before us concerns speech as well as conduct. Appellants merely rely upon its non-profit status in its allegation; this is not the basis of the present law.

When a statutory provision burdens first amendment rights, it must be justified by a compelling state interest. *Williams v. Rhodes*, 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). A primary purpose of the DTPA is to provide consumers with a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common-law fraud or breach of warranty suit. *Smith v. Baldwin*, 611 S.W.2d 611, 616 (Tex.1980). A further purpose, when assessing additional damages under the DTPA, is to punish the wrongdoer for knowingly violating the Act. *Blue Island, Inc. v. Taylor*, 706 S.W.2d 668, 670 (Tex.

App.—Corpus Christi 1985, writ ref'd n.r. e.). Protecting the innocent public from those deliberately engaging in deceptive practices is a justifiable compelling state interest. The "laundry list" in section 17.-46 shows how many possible ways there are to defraud the public, and the need for a rule protecting consumers. It is obvious that appellants pose a threat of the danger that prompted the regulation; advertising was intentionally, deceptively utilized to bait women into believing they would receive services from appellants. Not only did they not receive the services offered, they were deceived into giving personal information and watching films showing graphic scenes and pictures in order to emotionally force them into accepting appellants' viewpoint.

Finally, the DTPA is narrowly tailored to fit its purpose; it does not prohibit speech in any way, it merely insures that the stream of information to the public is not false. *Gertz*, 418 U.S. at 340, 94 S.Ct. at 3007. False and misleading representations in advertising are not shielded by the first amendment as "unprotected speech;" such statements may be banned entirely. *Better Business Bureau, Etc. v. Medical Directors*, 681 F.2d 397, 398 (5th Cir.1982). Appellants' fourth point of error is overruled.

By their fifth, sixth and seventh points of error, appellants maintain that the DTPA as applied to their conduct violates their rights of freedom of press and religion, as guaranteed by the fourteenth amendment and article I, section 8 of the Texas Constitution. Appellants further contend they have an inalienable right to disseminate information. Appellants cite no authority in support of these propositions, and wholly fail to brief point of error seven; these points of error are overruled. *See State ex rel. Danner v. City of Watauga*, 676 S.W. 2d 721, 723 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.).

By their eighth point of error, appellants allege that the trial court erred in entering judgment against Pelletier because there is no evidence that the Center has not functioned as a proper corporate entity.

In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidence and inferences to the contrary *See Larson v. Cook Consultants, Inc.,* 690 S.W.2d 567, 568 (Tex.1985); *International Armament Corp. v. King,* 686 S.W.2d 595, 597 (Tex. 1985); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the findings upheld. *In re King's Estate,* 244 S.W.2d at 661–62.

A "no evidence" point of error must and may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Commonwealth Lloyd's Ins. Co. v. Thomas,* 678 S.W.2d 278, 288 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEXAS L.REV. 361 (1960).

█ In reviewing only supporting evidence, there is sufficient testimony that appellants intentionally placed deceptive advertisements in the Yellow Pages; that they utilized deceptive practices over the phone to coerce women to come to the Center; that the women would not have come to the Center had they been told the truth and not been deceived; that appellants approved and followed instructions within the manual, which was the primary basis from which appellants' business operated, on how to go about these deceptive practices. Finally, the jury found that appellants had perpetrated acts of misrepresentation and fraud. Point of error eight is overruled.

█ By their ninth point of error, appellants contend that the trial court erred in assessing civil penalties against Pelletier in that the jury only assessed penalties against the corporation.

The "[c]ourts will not ... hold individual officers, directors or stockholders liable ... except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations." *Torregrossa v. Szelc,* 603 S.W.2d 803, 804 (Tex.1980), citing *Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 S.W.2d 336, 340 (Tex.1968).

There is evidence that Pelletier started the business; had it incorporated under two names; placed all advertising; ordered the Pearson Foundation manual and ran the business on its recommendations; was president of the corporations; participated in counseling the women who came to the Center; instructed his volunteers on how to run the Center and answered the telephones. The jury found that Pelletier controlled and dominated the Center's corporate affairs, and that a separateness of the corporate identity had ceased to exist. This testimony adequately shows that Pelletier dominated the day-to-day corporate affairs.

There is also sufficient evidence showing harm caused by Pelletier's actions. Fifteen women testified to the harm done to them by appellants' conduct, both financially and emotionally. There are in the record approximately 75 patient intake forms with information written by appellants' volunteers showing patients' anger and emotional distress at being "misled."

Finally, holding only the corporate entity liable would promote injustice. Appellant Pelletier is the sole motivator in causing the deception in question; by enabling him to avoid personal liability, he will avoid the DTPA and the legislature's intentions in promulgating the statute. He will further avoid any responsibility for illegalities perpetrated by himself while hiding behind a corporation.

We find that the jury's findings and the trial court's conclusions are legally and factually sufficient. Appellants' ninth point of error is overruled.

Appellants' final point of error argues that the trial court erred in refusing to allow visual presentations into evidence. The trial judge viewed the filmstrip and slide show and ruled, pursuant to rule 403 of Texas Rules of Civil Evidence, that the unfair prejudice outweighed the probative value of the films. The judge further stated that introduction of the films would turn the trial into a debate on abortion issues, thus leading the jury away from the issues properly before the court. The court allowed appellants to oppose the testimony of the State's witnesses with witnesses of their own.

When exclusion of evidence is the basis for a point of error, reversal of a trial court's judgment is not justified unless an examination of the record as a whole leads to the conviction that the error in refusing to admit the testimony was calculated to cause and probably did cause the jury to give a different answer than the one it did to all issues necessary to support the judgment. *State v. Parrish*, 159 Tex. 306, 320 S.W.2d 330, 332–33 (1958); TEX.R.APP.P. 81(b).

The article on evidence found in 29 Am. Jur.2d *Evidence* sec. 769 (1967) states:

A certain amount of discretion as to the receipt in evidence of real or demonstrative evidence must rest in the trial court, and the court must be alert to eliminate any abuse of the principles of real or demonstrative evidence where such evidence would *give an unnecessary dramatic effect or would unduly emphasize some issues at the expense of others.*

*Id.* at 838 (emphasis added). This was the very reason the trial judge excluded the evidence in question. Appellants have not met their burden in showing that the exclusion of the evidence was calculated to cause and probably did cause an improper verdict.

Further, the proffered videotape was cumulative of evidence which was fully developed by the testimony of various witnesses produced at trial. Appellants had two witnesses testify as to the slide presentation and the film shown at the Center; one

witness was a lay person who had previously obtained abortions, the other a previous owner of abortion clinics and present right-to-life representative. Both women testified as to the truthfulness and appropriateness of the presentations, stating that they depicted necessary and useful information. For the reasons listed above, the exclusion of such evidence is not error. *See Sinko v. City of San Antonio*, 702 S.W.2d 201, 205 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); *Bobbie Brooks, Inc. v. Goldstein*, 567 S.W.2d 902, 905 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.). Appellants' tenth point of error is overruled.

In considering the issues before us, we would echo Justice Jordan's opinion concerning the matters at hand:

This opinion is not to be construed or considered in any manner as approval or sanction of appellant's camouflage tactics evidenced by the record in this case. There is no question that appellant's employees purposefully attracted pregnant women to their facility by disseminating information which could lead these women to believe that abortions were available there.

*Mother & Unborn Baby Care v. Doe*, 689 S.W.2d 336, 339 (Tex.App.—Fort Worth 1985, writ dism'd). The purpose of appellants' actions cannot justify an improper method of achievement. The judgment is affirmed.

BURDOCK, J., dissents.

BURDOCK, Justice, dissenting.

I respectfully dissent.

The majority has improperly applied the Deceptive Trade Practices Act (DTPA) to the facts of this case. In doing so, the majority has held that any advertisement that is of questionable interpretation is a deceptive trade practice. Although I disagree with the majority's holding, I do not intend to imply that I approve of any form of fraudulent or misleading advertising.

Here, the appellants devised a way to get their pro-life messages to women who were seeking abortions. This is not the type of activity the legislature sought to protect consumers from when the DTPA was enacted.

According to the former chief of the Consumer Protection Division of the Attorney General's Office, prior to 1973, the consumer was at the mercy of unscrupulous people in the market place:

> Debt collectors could work misery on debtors through incessant phone calls, profane language, and fraudulent misrepresentations. Landlords could interrupt a tenant's utility service, bar him from his premises and wrongfully withhold his security deposit. Door-to-door salesmen could pressure people into purchasing expensive items they neither needed nor wanted and sellers, generally, could grossly exaggerate the value of their goods and services. This conduct was not necessarily lawful; much of it was not. The problem was that the remedies for such abuse were so woefully inadequate as to render virtually meaningless what rights a consumer did have. Even if an individual set of facts met the requirements for a cause of action, the time and cost of litigation when contrasted with the generally small recovery potential caused most consumers to simply 'grin and bear it,' leaving the wrongdoers to continue business as usual.

Philip K. Maxwell, *Public and Private Rights and Remedies Under The Deceptive Trade Practices—Consumer Protection Act*, 8 St. Mary's Law Journal 617, 618 (1976–77).

The fact that the women met the definition of a consumer is not alone sufficient to imply coverage of the DTPA. In my review of the record, no one was actually offered an abortion. Further, my research of the DTPA leads me to believe that the underlying transaction must be commercial for the DTPA to apply. Here, the underlying transaction was moral in nature, not commercial. As I have discovered no authority which I believe would properly bring the facts of this case under the auspices of the DTPA, I would reverse the judgment of the trial court and render judgment for the appellants.