The **TUSCARORA CORPORATION, Tuscarora Acquisition Company No. 6, Inc., and Tuscarora Acquisition Company No. 7, Inc., Appellants,**

v.

**HJS INDUSTRIES, INC., Appellee.**

No. 13–88–312–CV.

Court of Appeals of Texas, Corpus Christi.

May 31, 1990.

Rehearing Overruled Aug. 31, 1990.

Frank E. Perez, Royston, Rayzor, Vickery & Williams, Brownsville, Daniel Virnich, Denver, Colo., Ron Hole, Atlas & Hall, McAllen, Jack Pew, Jr., Jackson, Walker, Winstead, Cantwell, Dallas, for appellants.

John Haywood, Law Offices of John Haywood, P.C., Brownsville, for appellee.

Before SEERDEN, UTTER and DORSEY, JJ.

## OPINION

SEERDEN, Justice.

A jury found that Ellett Brothers (Ellett), a sporting goods and firearms distributor owned by The Tuscarora Corp.,[1] breached an exclusive contract to buy guns, causing HJS Industries, Inc. (HJS) lost profits of $44,157.00 and consequential damages of $95,710.30. The trial court entered judgment on the verdict, including attorney's fees, and added costs and interest. While HJS had also sued Presco Industries (Presco), from which Tuscarora bought Ellett's assets, Presco did not appear, and the judgment is against both Presco and Tuscarora, jointly and severally.

Tuscarora raises fourteen points of error. HJS has filed a conditional cross-appeal in which, by twenty points, it complains that the trial court refused to submit issues and instructions to the jury on three theories, other than the contract theory, which it claims to have also pleaded and proved. We reverse the judgment of the trial court.

HJS, a small company which Herman J. Seminiano and his wife, Caryl Seminiano, owned and operated, manufactured two models of handguns, the Frontier Four and the Lone Star. Ellett, a national distributor of handguns and sporting goods, contracted with HJS to distribute these guns nationally. This suit arises out of the nature of the agreement between HJS and Ellett, whether the agreement was breached and, if it was, whether Tuscarora assumed the liability for the breach when it acquired Ellett from Presco.

In answer to special issues, the jury found that Presco d/b/a Ellett contracted with HJS for the purchase of 4800 guns, that the contract was performable within one year starting in September, 1983, and ending in September, 1984, and that Presco d/b/a Ellett breached the contract, causing HJS to lose profits and suffer consequential damages.

The jury further found that Tuscarora assumed the liabilities and obligations of Presco, that both Presco and Tuscarora breached their duty of good faith in the performance of the contractual obligations with HJS, and that the breach of these duties proximately caused damage to HJS, and assessed various amounts of damages and attorney's fees. Based upon the jury verdict, the court entered judgment against Presco and Tuscarora jointly and severally for $193,346.76, which included pre-judgment interest and attorney's fees. The judgment denied any relief against Ellett Brothers, Inc.

The HJS/Ellett contract is reflected in a letter dated August 15, 1983, from HJS to Ellett and in a purchase order from Ellett to HJS dated October 5, 1983. The letter of August 15th purports to confirm the discussions between representatives of the two companies and sets out, among other items, that Ellett will be the exclusive national distributor for HJS products, that HJS will furnish a combined volume of 400 units per month (a unit consists of either of the two guns manufactured by HJS), starting with 50 units per month until back orders are filled, and increasing at a minimum of volume of 50 units per month. Ellett issued a purchase order dated October 5, 1983, for 2800 of the Frontier Four model and 2000 of the Lone Star model, at

---

1. Presco Industries acquired Ellett's assets in May, 1983, and sold them to Tuscarora effective January 30, 1985. Several subsidiaries of Tuscarora, Tuscarora Acquisition Co. No. 6 (Tac 6), Tuscarora Acquisition Co. No. 7 (Tac 7), and Tuscarora Acquisition Co. No. 8 (Tac 8), participated in the transfer, and merged into Tuscarora in 1986. The attorneys agreed that if the Tacs assumed liability, Tuscarora assumed it. We will refer to all of those companies as Tuscarora.

a total cost of $308,000.00 to be billed and shipped to Presco d/b/a Ellett. A letter accompanying the purchase order requested HJS to release the guns at the rate of 400 per month, unless otherwise notified.

The evidence regarding performance of this contract is conflicting. It is undisputed that during the term of the contract only 225 guns were sent from HJS to Ellett. Each party blamed the other for this. The jury resolved this issue against appellant, and Tuscarora does not dispute the sufficiency of the evidence on which that finding is based.

In December, 1984, Preston Kerr, owner of 50% of the stock in Presco, Inc., of which Ellett Brothers was a wholly-owned subsidiary, agreed with Tuscarora to structure a transaction so that either I) Presco would merge with Tuscarora, II) Tuscarora would purchase the stock of Presco, or III) Tuscarora would buy all the assets and liabilities of Presco. The total consideration for the transaction was to be $6,100,000.00. This transaction culminated in an Asset Purchase Agreement between Preston Kerr, Presco Industries, and Tuscarora on January 30, 1985. Through this agreement, Tuscarora purchased all the assets of Presco except one particularly described promissory note, free of all liabilities except those appellant expressly assumed.

By its first two points of error, appellant claims that under the unambiguous written agreements, appellants did not assume the liability asserted here, and that there is either no evidence or insufficient evidence that appellants assumed this obligation. Tuscarora argued at trial that it bought all of Ellett's assets (except for a certain promissory note), but only assumed some of the liabilities with the instrument styled "Assets Purchase Agreement" effective January 30, 1985. It argued that liability for any breach of the HJS/Ellett contract was not transferred.

If there is no ambiguity, contract construction is a question of law for the court. *Westwind Exploration, Inc. v. Homestate Sav. Ass'n,* 696 S.W.2d 378, 381 (Tex.1985); *Cambridge Oil Co. v. Huggins,* 765 S.W.2d 540, 543 (Tex.App.—Corpus Christi 1989, writ denied). Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in the light of the circumstances existing at the time it was made. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987). Only if the court finds a contract ambiguous is a fact issue created. *Security State Bank v. Valley Wide Electrical Supply Co.,* 752 S.W.2d 661, 665 (Tex.App.—Corpus Christi 1988, writ denied); *see Cohen v. Rains,* 769 S.W.2d 380, 389 (Tex.App.—Fort Worth 1989, writ denied).

We determine whether this particular liability was transferred as a matter of contract law from the terms of the Asset Purchase Agreement. Paragraph 3 of the agreement states,

Except as otherwise provided herein, the Purchaser agrees to assume and pay when due *all liabilities and obligations of the Company* (i) referred to or reflected in the Financial Statements referred to in paragraph 5(e) hereof, (ii) incurred in the ordinary course of business from October 31, 1984 through and including the time of closing, *and* (iii) except as otherwise provided hereinafter, *disclosed on the Disclosure Statement* referred to in paragraph 5 hereof. (Emphasis added).

Paragraph 3 continues by naming excluded liabilities, none of which include the liability in this suit.

The Disclosure Statement, indexed to the Asset Purchase Agreement, lists as specifically assumed:

(v) 1. Purchase orders entered into in the ordinary course of business....

3. Contracts entered into in the ordinary course of business of a type not required to be described or reflected in the Financial Statements (e.g. automobile leases, copy machine leases and service agreements, etc.) ...

*General:* Liability to be assumed include obligations entered into in the ordinary course of business before November 1, 1984 of a type not required by generally accepted accounting prin-

ciples to be reflected in the Financial Statements.

Paragraph 5 of the Asset Purchase Agreement states:

> *Representatives and Warranties of the Company and the Shareholder.* In order to induce the Purchaser to enter into this Agreement and the transactions contemplated hereby, the Company and the Shareholder hereby represent and warrant to the Purchaser that, except as otherwise set forth in the Disclosure Statement ...
>
> (v) *Contracts.* The Company has no presently existing contract or commitment extending beyond January 31, 1985, or involving payment by the Company of more than $10,000 in any year except those described in the Financial Statements.

HJS argues that since the purchase order for the 4800 guns was entered into in the ordinary course of business, Tuscarora assumed liability for it under (v) 1 of the Disclosure Statement. One of its witnesses opined that liability was transferred through the *"General"* paragraph of the Disclosure Statement. Tuscarora argues that (v) 1 only transfers commitments extending beyond January 31, 1985.

One of the main differences in the approaches of Tuscarora and of HJS in interpreting the contract is that HJS views the liability as the purchase order which was not honored and Tuscarora defines it as "the lawsuit" or as threatened litigation. Tuscarora bases its view on the fact that HJS's attorney's demand letter arrived at Ellett a few days before the consummation of the transfer from Presco to Tac 6. By its view the liability then became "threatened litigation" and *necessarily* was no longer an unfulfilled contract or purchase order.

The contract between HJS and Ellett Brothers for the purchase of the 4800 guns was to be performed within one year ending in September, 1984. In June, 1984, Ellett advised HJS by letter that it would not accept any more guns.

■ Tex.Bus. & Com.Code Ann. § 2.106(c) (Vernon 1968) provides that when a contract terminates, "all obligations which are still executory on both sides are discharged but any right based on prior breach of performance survives." [2] As a matter of law, the liability for nonperformance of the contract was different from the obligation imposed by the contract while it was in force.

We now examine the asset transfer documents to determine whether Tuscarora assumed liability for Ellett's breach of the HJS contract. It is undisputed that this liability is not included in the Financial Statements, and that Tuscarora had no knowledge of the HJS/Ellett dispute or of the January 15, 1985, demand letter. The liability is not assumed through the Asset Purchase Agreement's paragraph 3 unless it is part of the Disclosure Statement. The Disclosure Statement listed certain liabilities in paragraphs labelled in conformity with the subparagraph numbers of the Asset Purchase Agreement's paragraph 5, which was a list of warranties. The liability was not, on January 30, 1985, a purchase order or a contract to bring it under (v) 1. or (v) 3. of the Disclosure Statement. The *General* paragraph at the end of the Disclosure Statement transfers obligations "entered into in the ordinary course of business before November 1, 1984." Since the obligation for the breached contract arose before November 1, 1984, whether it was entered into "in the ordinary course of business" determines whether Tuscarora assumed it. Black's Law Dictionary (5th

---

**2.** Even if HJS could keep the contract open after receiving the June, 1984, letter repudiating it, and after it expired unperformed in September, 1984, it foreclosed any such options by sending a demand letter on January 15, 1985, demanding its lost profits and threatening to sue. *See Greenwall Theatrical Circuit Co. v. Markowitz,* 97 Tex. 479, 79 S.W. 1069, 1071 (1904); *Humphrey v. Showalter,* 283 S.W.2d 91, 94 (Tex.Civ.App.—Eastland 1955, writ ref'd n.r. e.); *see also Wellington R.R. Comm. v. Crawford,* 216 S.W. 151, 156 (Tex.Comm'n App.1919); *Vise v. Foster,* 247 S.W.2d 274, 280 (Tex.Civ.App. —Waco 1952, writ ref'd n.r.e.); Comment 4, Tex.Bus. & Com.Code Ann. § 2.610 (Vernon 1968).

ed. West 1979) defines ordinary course of business as

> The transaction of business according to the usages and customs of the commercial world generally, or of the particular community or (in some cases) of the particular individual whose acts are under consideration. Term used in connection with sales made by a merchant as part of his regular business and in contrast with a sale in bulk which is regulated by statute, e.g. U.C.C. § 6.102(1). In general, any matter which transpires as a matter of daily custom in business.

We hold, as a matter of law, that claims for breach are not entered into in the "ordinary course of business." Thus, Tuscarora is not liable for any breach of the HJS/Ellett contract as a matter of law. We sustain Tuscarora's point one, and reverse the judgment as it pertains to Tuscarora and order that HJS take nothing from Tuscarora on the contract claims. Since we have sustained point one, we need not address its remaining points. Tex.R.App.P. 90(a).

By its crosspoints 1, 8, and 14, HJS complains of the trial court's granting of a motion for directed verdict on its DTPA,[3] negligence and gross negligence, a breach of fiduciary duty and duty of good faith arising from a special relationship causes of action. Since we have determined under point one that Tuscarora did not assume liability for Ellett's dealings with HJS until it acquired Ellett in January, 1985, we restrict our review of the facts to Ellett's activities after that date.

Tuscarora responds that the trial court correctly perceived this as simply a breach of contract case, and that Texas did not recognize an action for breach of warranty of services under the DTPA. It denies any possible liability for negligence or gross negligence, asserting that HJS claimed no independent tort damages. It also denies any evidence showed a "special relationship" or "unequal bargaining power" to bring it within the tort duty of good faith described in *Arnold v. Nat. County Mut.*

*Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987).

In reviewing a directed verdict, we must determine whether any evidence of probative force raises fact issues on the material questions presented. *Quantel Business Syss., Inc. v. Custom Controls Co.*, 761 S.W.2d 302, 304 (Tex.1988); *Saenz v. Starry*, 774 S.W.2d 730, 731 (Tex.App.— Corpus Christi 1989, writ denied). We view the evidence in the light most favorable to the party against whom the verdict was directed and disregard all contrary evidence and inferences. *Quantel*, 761 S.W.2d at 303; *Starry*, 774 S.W.2d at 731.

There was evidence to show that Ellett agreed to be HJS's exclusive distributor and national manufacturer's representative. The facts would support that this was the main thrust of the contract, and that the sale of the 4800 guns was secondary to it. The agreement included a price structure to be followed in sales from HJS to Ellett and from Ellett to distributors and retailers. HJS contends that Ellett took advantage of its position and began a harmful advertising campaign which disregarded the agreed prices. Herman testified that HJS tried to resume business relations with other representatives, distributors, and retailers after Ellett's cancellation, but they had difficulty getting orders. They did not know of Ellett's advertising at least at first. By January, 1986, HJS was forced out of business.

HJS introduced a series of Ellett fliers sent to retailers nationally starting in October, 1984. They advertised specials and limited quantities. The June 10–July 5, 1985, flyer ran a front-page ad with the words, "closeout special" and "limited Quantity." An ad in the September 16–October 11, 1985, flyer offered the Lone Star even below Ellett's cost.

HJS argues that the price-cutting campaign during Tuscarora's ownership of Ellett was a vicious retaliatory scheme in which each step in their lawsuit was met by a price drop. It introduced evidence from

---

**3.** Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. sec. 17.41 *et seq.* (Vernon Supp. 1990).

which one could infer that following the service of citation for this lawsuit, Ellett reduced its price to retail stores to the price established for sale to distributors, and following the removal of this case to Federal Court, Ellett reduced its price to retail stores to *below* HJS Industries established price to distributors and, because of its favorable purchase price as the exclusive distributor, was still able to profit. Shortly after the initiation of discovery by HJS's Industries' attorney, Ellett again reduced its advertised price.

Evidence showed that Ellett had a strict policy against price-cutting and knew that such tactics stigmatized a product to potential buyers, causing them to believe the product would no longer be manufactured, that it might be inferior, or that parts and service would not be available. There was evidence to show that Ellett had no legitimate reason to cut price, and normally would not do so before running a sale contest or offering buyers generous terms.

Herman testified that Ellett's conduct destroyed his business. Specifically, he and Caryl recounted the loans they had taken out to start the business, the extension of the loans while they tried to reestablish sales, the inability to market the guns because of the fliers, and the ultimate closing of the business with $100,000 debt.

We now address whether HJS was entitled to jury determination of its DTPA claims. By its Fourth Amended Original Petition, HJS alleges numerous violations which must have occurred before or during the contract period. However, it alleges an unconscionable action or course of action, DTPA sec. 17.50(a)(3), sec. 17.45(5)(A) and (B) to be a producing cause of actual damages, and proper notice under sec. 17.-50A(a).

■ One who seeks or acquires, by purchase or lease, any goods or services is a "consumer" under sec. 17.45(4). *Cameron v. Terrell & Garrett, Inc.* 618 S.W.2d 535, 539 (Tex.1981). Whether a plaintiff is a consumer is a question of law for the trial court to determine from the evidence. *Commercial Escrow v. Rockport Rebel, Inc.,* 778 S.W.2d 532, 536 (Tex.App.—Cor-

pus Christi 1989, writ denied); *First Federal Sav. & Loan Ass'n v. Ritenour,* 704 S.W.2d 895, 898 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). A plaintiff establishes its standing as a consumer by a relationship with the transaction, not by a contractual relationship with the defendant. *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 366 (Tex.1987); *Commercial Escrow,* 778 S.W.2d at 536. The only requirement is that the goods or services the plaintiff sought or acquired form the basis of its complaint. *Kennedy v. Sale,* 689 S.W.2d 890, 892–93 (Tex.1985); *Commerical Escrow,* 778 S.W.2d at 536.

■ If in the context of a transaction in goods or services, any person engages in an unconscionable course of action which adversely affects a consumer, that person is subject to liability under the DTPA. *Mother & Unborn Baby Care v. State,* 749 S.W.2d 533, 538 (Tex.App.—Fort Worth 1988, writ denied), *cert. denied,* —— U.S. ——, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989); *First Texas Sav. Ass'n v. Stiff Properties,* 685 S.W.2d 703, 705 (Tex.App.—Corpus Christi 1984, no writ).

■ Since the contract had been repudiated and the exclusive distributorship had expired prior to Tuscarora's acquisition of Ellett's assets, Tuscarora was not obligated to dispose of the HJS guns within the price structure of the terminated contract. We hold HJS was not a consumer of any services of Tuscarora and therefore Tuscarora's actions were not deceptive trade practices with the meaning of the DTPA. We overrule crosspoint one.

■ By crosspoint fourteen, HJS complains of the trial court's directing a verdict denying its fiduciary duty and good faith claims. HJS pleaded that it placed its confidence and trust in defendants and justifiably relied on them to act in its best interests. It alleged that defendant's acts constituted a breach of their common law and statutory convenants and duties of good faith, as defined by law and required by fair business practice, and the fiduciary duties of loyalty, full disclosure, and a high degree of care to HJS.

Clearly by the time Tuscarora acquired Ellett, Ellett no longer acted as exclusive distributor and manufacturer's representative. No evidence showed that Ellett had any duty, toward a prior supplier with whom it had severed relations, to protect its business reputation. We overrule crosspoint fourteen.

■ By point eight, HJS cites as error the trial court's directing a verdict on its negligence and gross negligence causes of action. HJS pleadings contain numerous allegations, including that Ellett sold HJS products at prices below previously established prices. Some of this occurred after Tuscarora acquired Ellett. HJS pleaded that Ellett's negligence was of such a character that it was guilty of reckless conduct and gross negligence, and that the acts and omissions involved such entire want of care that they could have only resulted from conscious indifference to or reckless disregard of HJS's rights and welfare.

Retaliatory pricing such as that which HJS describes is a tort. However, it is an intentional tort the negligence allegations do not cover. No evidence showed any duty in the industry to maintain price after a distributorship terminated. We overrule point eight.

■ The parties argue their directed verdict crosspoints together with crosspoints about special issues which the trial court refused to submit. Once a trial court directs a verdict, the party against whom the verdict is directed does not need to submit issues to preserve error. We do not reach the remaining crosspoints. Tex.R. App.P. 90(a). We REVERSE the trial court's judgment insofar as it relates to Tuscarora and RENDER that HJS take nothing from Tuscarora. In all other respects, we AFFIRM.

UTTER, J., not participating.