**WORD OF FAITH WORLD OUTREACH CENTER CHURCH, INC., a Church non-profit Texas corporation, Robert G. Tilton and Martha Phillips Tilton, Plaintiffs,**

v.

**Dan MORALES, in his official capacity as Attorney General of the State of Texas, Defendant.**

**Civ. No. A 92 CA 089.**

United States District Court,
W.D. Texas,
Austin Division.

March 18, 1992.

Diane M. Henson, Graves, Dougherty, Hearon & Moody, Austin, Tex., J.C. Joyce, Joyce & Pollard, Tulsa, Okl., for plaintiffs.

Rose Ann Reeser, David Guillory, Texas Atty. General's Office, Austin, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

SPARKS, District Judge.

This case involves serious issues of the rights of freedom of religion and of association under the First Amendment of the Constitution of the United States, Article 1 § 6 of the Texas Constitution, and the governmental rights of the State of Texas in

enforcing its laws regarding non-profit corporations chartered under state law.

On November 21, 1991, ABC's *Prime Time Live* published a television network special involving, in part, the Word of Faith World Outreach Center Church, Incorporated, and Robert G. Tilton, two of the three plaintiffs in this lawsuit. The import of this publication was not flattering to either the church or Mr. Tilton, but the accuracy or inaccuracy of the reporting is not relevant to the issues in this lawsuit.[1] Subsequent to November 21, 1991, the attorney representing Word of Faith World Outreach Center Church, Inc. and Robert G. Tilton, wrote federal and state governmental agencies, including the Attorney General of the State of Texas, and offered to meet with these governmental agencies and to permit review and inspection of the church's records for the purpose of satisfying the governmental agencies that the allegations made in *Prime Time Live* were false. The United States Postal Service and the Federal Bureau of Investigation accepted this offer, conferred with the attorney and were furnished with any records of the church requested, including financial records documenting the revenues and expenditures of the church. The Attorney General declined this invitation both initially and subsequently.

On January 13, 1992, the Consumer Protection Division of the Office of the Attorney General of Texas sent to the Plaintiffs, by facsimile transmission, a demand for documents pursuant to the Texas Deceptive Trade Practices–Consumer Protection Act (Sec. 17.41, *et seq.*, of the Texas Bus. & Com. Code of the State of Texas). The demand states in the first paragraph:

The Consumer Protection Division of the Office of the Attorney General has reason to believe that Word of Faith Family Church and World Outreach Center ... has engaged in trade practices and charitable solicitations which may violate provisions of state law including the Texas Consumer Protection and Deceptive Trade Practices Act....

Both the nature and extent of the documents demanded were not reasonable and included documents clearly the Attorney General was not entitled to obtain from any religious organization and/or church.[2]

Upon receipt of the January 13, 1992, demand, the Plaintiffs, through their counsel, again requested a meeting with the Attorney General and his personnel, and, for reasons still unclear and unconvincing to the Court, the Attorney General and his personnel continued in their refusal to meet with the attorney representing the Word of Faith World Outreach Center Church, Inc. and Mr. and Mrs. Tilton. The church and Mr. and Mrs. Tilton clearly had First Amendment rights to assert to the demand for documents made on January 13, 1992, and did so on their own behalf and their members.

Thereafter, the Attorney General, following an oral request to do so, remitted, by facsimile transmission, the January 13, 1992, document demand to the press and television media. The Attorney General justifies this action by its own interpretation of Art. 6252–17a, V.A.T.S., and contends there was no choice but to deliver to the media this document notwithstanding the express terms of the statute under which the demand was made, which specified information obtained from such a request was confidential and could not be released except by court order.[3] The publi-

1. Likewise, the religious beliefs, practices and testimonies of Mr. and Mrs. Tilton for the Church and themselves are immaterial to the issues in this case as the Attorney General stipulated Word of Faith World Outreach Center Church, Inc. is a bona fide church holding sincere religious beliefs.

2. On January 13, 1992, the Attorney General and his staff well knew they were dealing ostensibly with a church and its minister and had to anticipate First Amendment problems.

3. Section 17.61(f) of the Texas Deceptive Trade Practices–Consumer Protection Act expressly excepts this information from public disclosure, as does Art. 1302–5.04 of the Texas Miscellaneous Corporation Laws Act, and Articles 6252–17a(3)(a)(1) and (2) of the Open Records Act authorizes nondisclosure by the Attorney General.

cation of the January 13, 1992, Attorney General demand to the media resulted in wide spread, unfavorable publicity to the church and Mr. Tilton. This action by the Attorney General had the overall effect of "hardening" the attitude of the church, the Tiltons, and their counsel against any cooperation with the Office of the Attorney General and the release of any documents whatsoever.

Notwithstanding, counsel for the church and the Tiltons again requested a meeting with the Attorney General and represented, orally and in writing, that, if the representatives of the Attorney General could convince his "clients" that records should be examined, the records would be made available. Again, the Attorney General declined any meeting. Counsel for the church and the Tiltons then advised the Attorney General he would file a lawsuit in the United States District Court before the deadline of February 10, 1992, to determine their respective rights and privileges. On February 5, 1992 (five days before the deadline date set by the Attorney General for the inspection and copying of the documents demanded on January 13, 1992), the Attorney General, pursuant to Art. 1302–5.05, filed a petition *in quo warranto* in the Probate Court of Travis County, Texas.[4] The petition *in quo warranto*, verified by the department head of the Consumer Protection Division of the Attorney General, expressly alleged:

This suit is brought in the nature of *quo warranto* against the

Defendant corporation ... *for the purpose of obtaining a permanent injunction ordering Defendant to produce records as requested by the Attorney General, for forfeiture of Defendant's charter* and dissolution of the corpora-

tion, an appointment of a receiver to take possession of the affairs of the Defendant, *to rehabilitate,* to reorganize, conserve, or liquidate *the affairs of the corporation,* as the case may be.... *A further purpose of this suit is to obtain,* after notice and hearing, a temporary injunction and *a permanent injunction against the Defendant, its officers,* directors, stockholders, agents, employees, *and representatives whomsoever from conducting any business of the Defendant....* (emphasis added).

Further, said petition alleges:

Article 1302, Chapter 5, Texas Miscellaneous Corporation Laws Act, provides that the Attorney General or his representatives are entitled to examine any books or records of a Texas corporation *as he may deem necessary....* (emphasis added).

The testimony from the Assistant Attorney Generals in charge of this investigation, the records demand of January 13, 1992, and the filing of the *quo warranto* petition establish unequivocally that the Attorney General interprets the two statutes (Texas Deceptive Trade Practices–Consumer Protection Act and Texas Miscellaneous Corporation Laws Act) as giving the Attorney General complete discretion to request any documents from any corporate entity (including a non-profit corporation which operates as a church with its principal or sole purpose of religious activities). Now, after the filing of this lawsuit, the Attorney General admits its demand for documents of January 13, 1992, and its petition *in quo warranto* were inappropriate and should be amended in light of apparent recent knowledge he is dealing with a church.[5]

4. On February 5, 1992, the Attorney General deliberately did not seek to enforce the remedy under the Texas Deceptive Trade Practices–Consumer Protection Act by filing a lawsuit in a district court in Dallas, Texas, requesting an order that the Plaintiffs comply with the documents demanded on January 13, 1992.

5. It must be stated that the departmental head of the Consumer Protection Department, who personally verified the petition *in quo warranto,*

testified he believed that the pleadings in the *quo warranto* petition were simply what a "good lawyer" would plead under the circumstances. In addition, the March 4, 1992, amended document demand states that "[w]hile we [the Consumer Protection Division] do not adopt your legal position in this matter, in an effort to respond to your concerns, we submit to you this modified request for documents...." (emphasis in original).

The testimony of the department head of the Consumer Protection Division of the Office of the Attorney General is that the purpose of the filing of the *quo warranto* petition was to enforce its demand for the records of the church and Mr. Tilton. However, he admitted the timing and location of the filing was to attempt to insure the litigation would be in the Probate Court in Travis County rather than federal court where the Plaintiffs represented they would file this lawsuit.[6]

The Plaintiffs contend that frequent public comment by the Office of the Attorney General regarding the alleged investigation of the church and Mr. Tilton, as well as the conduct described above, constitutes such "bad faith" as to justify refusal to tender any documents of the Plaintiffs and to permanently enjoin the Attorney General from further investigation and public comment. The department head of the Consumer Protection Division of the Office of the Attorney General defends the public statements made by the Attorney General by testifying the staff made "no comment" statements to the media on 80 percent of its inquiries, apparently believing the other occasions of public comment, during an investigation, were appropriate and responsible conduct.

The Court expressly finds from the evidence that the actual statements made by Assistant Attorney Generals and the Attorney General did not technically accuse either the church and/or Mr. and Mrs. Tilton of anything, but, on each occasion of public comment, the publicity generated was negative to the church and the Tiltons. The Court finds from the evidence that the conduct of the Attorney General and his personnel in stating the Consumer Protection Division of the Office of the Attorney General had "reason to believe" the church and the Tiltons violated the Texas Deceptive Trade Practices–Consumer Protection Act when they had no substantial evidence for the accusations, the Attorney General's refusing to meet with or confer with the attorney representing the church, selecting

the documents demanded from both the church and the Tiltons on January 13, 1992, publishing to the media the accusations and demand of January 13, 1992, continuing to make public comment regarding the Plaintiffs, refusing all proffered cooperation from the Plaintiffs, and filing the verified petition *in quo warranto* on February 5, 1992, was neither professional nor responsible, bordering on the unethical, and constitutes "bad faith." This conduct is not what is expected of attorneys charged with the responsibility of being the legal representatives of the State of Texas.

However, the Court does not find this "bad faith" conduct prevents the Attorney General of Texas from *appropriately* using his authority to investigate the corporate plaintiff to determine if it is truly a non-profit corporation under Texas law.

### ABSTENTION

The Attorney General requests dismissal of this case under the abstention doctrine, contending that its *quo warranto* proceedings in the Probate Court of Travis County, Texas, filed on February 5, 1992, preempts this Court's action. The Attorney General relies on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and related cases.

As previously stated, the Court specifically finds from the evidence the Attorney General filed the petition *in quo warranto* on February 5, 1992, reacting to the representation by Plaintiffs' counsel a lawsuit would be filed in the United States District Court to determine the rights and privileges of the parties. The Attorney General, through his supervisor of the Consumer Protection Division, admits a purpose of the filing of the *quo warranto* proceedings was to attempt to establish venue and jurisdiction in the Probate Court of Travis County prior to the filing of any federal lawsuit. Thus, the *quo warranto*

---

**6.** The Court specifically finds the lawsuit filed by Attorney General on February 5, 1992, was a reaction to being advised the Plaintiffs would

file in federal court and an attempt by the Attorney General to invoke an abstention doctrine defense based on pending state litigation.

proceedings were filed with a purpose by the Attorney General to defend the federal lawsuit to be filed by February 10, 1992, on the grounds of abstention. For that reason alone, this Court does not believe that abstention would be appropriate in this case. *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977).

The Court finds specifically that it has jurisdiction over the parties and subject matter; that exceptional circumstances certainly exist; and that injunctive relief is necessary for the adequate protection of constitutional rights. *Ealy v. Littlejohn,* 569 F.2d 219 (5th Cir.1978).

However, there are other reasons for not bowing to the abstention request of the Attorney General. Despite the number of treatises and volumes of cases reviewed, this Court cannot determine any consistent pattern of the Courts in applying the abstention doctrine except that the exceptions are few and must be cautiously granted. It is beyond dispute freedoms of religious worship and of association are foundation pillars of our country. This is true no matter how "flim flam" the religious doctrines and procedures (including solicitation of funds from members and expenditures) of any particular church may appear to others. For generations Americans have died and been persecuted defending these specific constitutional rights.

In this particular case, the Attorney General of the State of Texas has utilized its own interpretation of a statute (Texas Deceptive Trade Practices–Consumer Protection Act) to publicly accuse a church of fraud and demand documents clearly constitutionally protected. The accusation and demand for documents and records are enforced by pleadings *in quo warranto* requesting dissolution of the corporate church, appointment of a receiver to manage its affairs, and an injunction against its ministers from conducting the business of the church which is admitted (by stipulation) to be a bona fide religious organization. These circumstances satisfy, in this Court's judgment, the requirements

on exceptions to abstention of irreparable injury being "great and immediate" and the conduct of the Attorney General as "bad faith, harassment or any other unusual circumstance that would require equitable relief."

The Court particularly finds persuasive Judge Debevoise's opinion in *New Jersey— Philadelphia Presbytery v. New Jersey State Bd. of Educ.,* 482 F.Supp. 968 (D.N.J. 1980), *aff'd,* 654 F.2d 868 (3d Cir.1981). There, like here, there were state actions to enforce substantively valid statutes that effectively stopped religious activities, including instruction, education and worship and to enjoin related individuals from the same. *See id.* at 973. Had the Attorney General merely filed a lawsuit in a Dallas state district court for the determination whether an order, pursuant to the Texas Deceptive Trade Practices–Consumer Protection Act (the statute under which the Attorney General alleges his authority to investigate and demand records in this case), should issue requiring the production of the records and documents, this Court, like Judge Debevoise, may have yielded to the state court on abstention grounds. But that is not the case, and the Attorney General's filing the *quo warranto* petition specifying the relief requested by the State under these circumstances compels this Court to act.

Furthermore, in *Smith v. Hightower,* 693 F.2d 359, 366–67 (5th Cir.1982), our Fifth Circuit, in affirming its previous holding in *Wilson v. Thompson,* 593 F.2d 1375 (5th Cir.1979), held there is a three-part test in determining an exception to *Younger.* The case at bar comes within this established rule.

First, the Court finds from the evidence that the Plaintiffs have established that their declining to deliver the records and documents demanded by the Attorney General was an exercise of legitimate and valid First Amendment rights, i.e. constitutionally protected.

Second, the Court finds from the evidence that the Attorney General's filing the *quo warranto* proceedings was motivated by a purpose to retaliate for or to

deter the church and the Tiltons from exercising their constitutional rights in declining to furnish the documents and records demanded, and this "retaliation" was a major motivating factor and played a prominent role in the Attorney General's decision to file the *quo warranto* proceedings.

Third, the Court finds from the evidence that the Attorney General would not have filed a *quo warranto* proceeding under these circumstances "but for" the church and the Tiltons' exercising their constitutional rights. The evidence does not even suggest the Attorney General had independent grounds for any such action.

Therefore, this Court declines to dismiss this case pursuant to the abstention doctrine.

Turning now to the merits, the Plaintiffs specifically seek to enjoin the Attorney General

> from conducting any *civil* investigation or investigation of any kind of the Plaintiffs' religion pursuant to the DTPA and the MCLA, and further to enjoin the Attorney General from forfeiting, or attempting to do so in any Court action, this Plaintiff Church's charter and its right to conduct its religious service in the State of Texas pursuant to the MCLA and further to prohibit the Attorney General from levying any fine against the Church pursuant to the MCLA and further to prohibit and enjoin the Attorney General from imprisoning Robert G. Tilton, the principal minister of this religion and/or his wife Martha Phillips Tilton, or any other member or employee of this Plaintiff Church pursuant to the MCLA, and further to prohibit the Attorney General from interfering, meddling or entangling with or in the religious and or financial affairs of Word of Faith World Outreach Center Church, Inc. or abridging the Plaintiffs' constitutional right of freedom of religion in any manner....

7. Specifically, the Attorney General stated he

*Plaintiffs' First Amended Original Complaint and Application for Injunctive Relief,* para. 19 (emphasis in original).

The Attorney General has requested the Plaintiffs to produce a lengthy list of documents, records, and other materials he believes relevant to his investigation of the Plaintiffs under the Deceptive Trade Practices–Consumer Protection Act (DTPA) and under the common law of charitable trusts.

Thus, this Court must determine (1) whether the DTPA applies to the Plaintiffs on its face; (2) whether the DTPA, as interpreted by the Attorney General, can be constitutionally applied to the church or its representatives; (3) whether the Texas Miscellaneous Corporation Laws Act ("MCLA") applies to the Plaintiffs on its face; (4) whether the MCLA, as interpreted by the Attorney General, may be constitutionally applied to the Plaintiffs; (5) whether the church is a charitable trust subject to Texas common law concerning charitable trusts; (6) whether the Attorney General may constitutionally investigate and inspect records of the church under Article 4, Section 22 of the Texas Constitution, which authorizes the Attorney General to inquire into the charter rights of private corporations and take action to prevent a corporation from exceeding its powers authorized by law; and (7) whether the Attorney General has the power and authority to investigate the church and inspect records under any other law, for instance the Texas Non–Profit Corporation Act, and, if so, to what extent may that power be exercised under state law and the United States Constitution.

### TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT

■ In his January 13, 1992, demand the Attorney General published he "had reason to believe that Word of Faith Family Church & World Outreach Center ... has engaged in trade practices and charitable solicitations which may violate provisions of state law including the Texas Consumer Protection and Deceptive Trade Practices Act ("DTPA")." [7] Accordingly, the Attor-

had reason to believe that the Church's activities

ney General required the production of documentary material for inspection and copying pursuant to the DTPA and the MCLA.

In his brief and in hearings before this Court, the Attorney General continues to maintain the Plaintiffs are subject to the DTPA because it is alleged they solicit and accept donations from members and others, distribute various pamphlets, books, and objects, and make certain representations that are not technically accurate. Plaintiffs, in opposition, argue that the DTPA does not apply as they are not engaged in "trade or commerce" and the contributors to the church ("members") are not "consumers" because no money is required to receive anything from the church or to have Mr. Tilton pray over returned objects or perform other acts and because contributors' donations are not requested for any specific purpose.

This Court agrees the Texas Deceptive Trade Practices–Consumer Protection Act has no applicability in this case. Although no Texas court has considered the applicability of the DTPA to church activities and donations, the language of the DTPA as well as Texas case law make clear the Plaintiffs are not subject to the DTPA.

The Attorney General's Office asserts its authority to investigate and inspect documents under the auspices of Sections 17.60 and 17.61 of the DTPA, which give the Attorney General power to investigate and inspect relevant documentary material when the Attorney General has "reason to believe that a person is engaging in, has

engaged in, or is about to engage in any act or practice declared to be unlawful by this subchapter [the DTPA]...." *See* Tex. Bus. & Com.Code Ann. §§ 17.60, 17.61 (Vernon's 1992 Supp.). Section 17.46(a) makes unlawful "[f]alse, misleading, or deceptive acts or practices in the conduct of any *trade or commerce*" and gives a list of some acts which fall within the definition of proscribed conduct. *Id.* § 17.46(a) (emphasis added).

"Trade" and "commerce" are defined in Section 17.45(6) as "the advertising, offering for sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, ...." In its brief the Attorney General focuses on "the advertising ... or distribution of any good or service" and claims that under this definition and the case of *Mother & Unborn Baby Care of N. Texas, Inc. v. State*, 749 S.W.2d 533 (Tex.App.—Ft. Worth 1988, writ denied), *cert. denied* 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), all that is needed to fall within "trade" or "commerce", and to be subject to the DTPA, is advertising or distribution of a good or service whether or not it is advertised as though it were for sale, and whether or not the recipient of the good or service believed it to be for sale or sought to purchase it.

Not only is this a misinterpretation of *Mother & Unborn Baby Care of North*

---

violated section 17.46(a) of the DTPA and the following provisions of section 17.46(b) of the DTPA:

(b)(2) Causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of *goods* or *services;*

(b)(5) Representing that *goods* or *services* have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

(b)(12) Representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

(b)(19) Representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve; and

(b)(23) Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the *consumer* into a transaction into which the *consumer* would not have entered had the information been disclosed.

January 13, 1992, letter from the Attorney General to the Tiltons (emphasis added). Note that the Attorney General would be unable to prove violations against the Church under any of the provisions using the words "goods", "services", and "consumer", regardless of the DTPA's applicability otherwise. As defined in Section 17.45, each of those words requires that a person seek to purchase or lease a good or service. *See* Tex.Bus. & Com.Code Ann. § 17.45(1), (2), (4).

*Texas, Inc. v. State,* in which the Court found that misleading advertising led women to believe doctors would perform abortions for a fee, *see id.* at 537, but the reading of the DTPA as a whole makes it clear that the Texas legislature was concerned with "business", not gratuitous, transactions. Furthermore, there must be some "consumer", either the plaintiff or, if the Attorney General is bringing the action, "consumers" within the statutory definition whose rights will be protected. *See generally,* Tex.Bus. & Com.Code §§ 17.41, *et seq.; see also Pennington v. Singleton,* 606 S.W.2d 682 (Tex.1980); *Mother,* 749 S.W.2d 533.

As stated by the Texas Supreme Court, "[l]egislative intent should be determined from the language of the entire Act and not isolated portions." *Pennington,* 606 S.W.2d at 686. "[L]egislative intent rather than the strict letter of the Act will control." *Id.* The Legislature's intent was clearly stated in Section 17.44. "This subchapter shall be liberally construed and applied to promote its underlying purposes, which are *to protect consumers* against false, misleading, and deceptive *business* practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex.Bus. & Com.Code Ann. § 17.44 (emphasis added). It is not just to be liberally construed, rather it is to be liberally construed to promote its express purposes. *See id.; see also Pennington,* 606 S.W.2d at 686, 688, 690.

Section 17.44 makes it clear that the "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" described in Section 17.46 must be "business" acts or practices. Solicitation of funds from church members, and new members,[8] is not a business practice. *See Murdock v. Pennsylvania,* 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943). The Attorney General cannot seize upon a technical ambiguity in one section of the Act to try to insure that Texas residents donate their money only in ways

he deems wise. The DTPA was meant to protect those residents from deceptive "business" acts and practices only.

Nor can the church's or Mr. Tilton's actions be described as "unconscionable", protection against which is also a purpose under Section 17.44. Donating money to a religious cause one believes in can hardly be to one's detriment as a result of being taken advantage of to a "grossly unfair degree". *See* Tex.Bus. & Com.Code Ann. § 17.45(5). That is clearly a value judgment the Attorney General is incapable of making in this case.

Finally, there are no grounds for a breach of warranty action, the only remaining purpose of the DTPA enumerated in Section 17.44. Because the DTPA does not define or create any warranties, the Attorney General must establish the existence of a warranty based on statutory or common law. *See La Sara Grain Co. v. First Nat'l Bank of Mercedes,* 673 S.W.2d 558, 565 (Tex.1984). Express or implied warranties arise out of contracts or sales. Again, the facts of this case show that no sales or contracts existed. Donations were distinct and separate from prayer requests and receipt of other materials or acts from Mr. Tilton or the church and cannot form the bases of sales or the consideration for contracts.

In addition to there being no "trade" or "commerce" to satisfy Section 17.46 and no action protected against under Section 17.44, there are no "consumers". The fact that Section 17.47, which gives the Consumer Protection Division the power to bring an action for injunctive relief, does not explicitly require the Attorney General to act on behalf of some consumer is irrelevant. The purpose of the DTPA is to protect "consumers" and no other class of persons. *See* Tex.Bus. & Com.Code Ann. § 17.44. That purpose is paramount to technical readings of individual sections. *See id.; see also Pennington,* 606 S.W.2d at 686.

Furthermore, the very name of the Act, the Deceptive Trade Practices–Consumer

---

**8.** Plaintiffs testified that a contributor is automatically considered to be a "member" of the church, and the Attorney General did not dispute this construction.

Protection Act, and the name of the agency in charge of enforcing the Act, the Consumer Protection Division, also indicate that the Attorney General can only act under the DTPA to protect consumers.

A "consumer" under the DTPA is a person "who seeks or acquires by purchase or lease, any goods or services...." Tex. Bus. & Com.Code Ann. § 17.45(2). In order to be a consumer, one must purchase or seek to purchase goods or services. *Rutherford v. Whataburger, Inc.,* 601 S.W.2d 441, 444 (Tex.App.—Dallas 1980, writ ref. n.r.e.) (plaintiff who had won a contest prize but not received it was not a "consumer" because he did not seek or purchase to seek the prize and because no purchase was required to enter the contest); *Mother,* 749 S.W.2d at 538 (women seeking abortions were "consumers" because they sought to purchase a service).

Contributors to the church do not seek to purchase goods or services. Plaintiffs do not advertise goods or services for sale. Contributors to the church are not required to give donations in order to receive pamphlets, books, or other goods. Nor is a donation required before Mr. Tilton will pray over a prayer request or perform other acts. There is nothing to make contributors to the church believe their contributions are in return for requested materials or acts by the church or Mr. Tilton. In fact, not only do members sometimes make "vows" or contributions without requesting any materials or acts to be performed by Mr. Tilton, but the church makes it a practice to inform persons who seek to "purchase" items that the church no longer sells anything and offers to refund their money. Contributors to the church are not "consumers", and the Attorney General may not bring a DTPA action to protect their interests.

█ Even if the DTPA were applicable to the Plaintiffs on its face, it still could not be constitutionally applied to the Plaintiffs as interpreted by the Attorney General. The fact that the DTPA has a valid purpose and was not enacted to discriminate against a religion or restrict the free exercise of a religion, does not mean any ef-

fects on the Plaintiffs are merely incidental and permissible under the First Amendment. *See, e.g., Wisconsin v. Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 1535–36, 32 L.Ed.2d 15 (1972); *Bates v. City of Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960); *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1171–72, 2 L.Ed.2d 1488 (1957); *Murdock,* 319 U.S. at 115, 63 S.Ct. at 876. The investigation sought by the Attorney General under the provisions of the DTPA in this case unduly burden the Plaintiffs' First Amendment rights to exercise their religion free from excessive governmental interference or entanglement.

Sections 17.60 and 17.61 of the DTPA give the Attorney General unfettered discretion to inquire into the inner workings of the church and inspect and copy its documents and records. Section 17.60 allows the Consumer Protection Division of the Office of the Attorney General to require the church to file a statement or report as to *"all* the facts and circumstances concerning the alleged violation and such other data and information *as the consumer protection division deems necessary"* whenever it "has *reason to believe* that a person is engaging in, has engaged in, or is about to engage in any act or practice declared unlawful by this subchapter, or when it *reasonably believes* it to be *in the public interest...."* Tex. Bus. & Com.Code Ann. § 17.60 (emphasis added). Section 17.61 gives the Consumer Protection Division authority to demand a person to produce documentary material and permit inspection and copying "[w]henever the consumer protection division *believes* that any person may be in possession ... of *any* documentary material relevant to the subject matter of an investigation of a possible violation of this subchapter...." *Id.* § 17.61(a) (emphasis added).

The Attorney General clearly interprets these sections as broadly as they appear, applying them to the Plaintiffs without consideration for any First Amendment Rights as a religious organization. In the January 13, 1991, document demand sent to the

Tiltons, the Attorney General demanded, amongst other things:

(1) Media plans and insertion data for television presentations and written solicitations made by the Church;

(2) All documents, shipping records, memoranda and other materials relating to the handling of prayer requests and any other solicitation material which is claimed to be the subject of any prayer or other entreaty to God by Robert Tilton or any other person employed by the Church from January 1, 1989, to and including the present;

(3) All cancelled checks and other documentary material relating to contributions sent to each orphanage, mission, ministry, and charitable organization by Robert Tilton or the Church during the period from January 1, 1989 to and including the present;

(4) Testimonials or complaints from any individuals who have sent money or anything else of value to Robert Tilton, Marte Tilton, the Church, or any other Church entity from January 1, 1989, to and including the present;

(5) List of all Church employees and consultants that have received in excess of $100,000 from the Church or any Church entity from January 1, 1987, to and including the present, including the name, address, and telephone number of each person and amounts received;

(6) List of all persons who have been paid or remunerated in any way in excess of $100,000 from the Church or any Church entity from January 1, 1987, to and including the present, including the name, address, and telephone number of each person;

(7) List of all persons who have sent contributions to the Church and any other Church entity from January 1, 1989, to and

including the present, including name, address, telephone number, amount and date of contribution;

(8) List of all vendors and/or contract labor that have received payments in excess of $50,000 from the Church and any other Church entity from January 1, 1987, to and including the present, including name, address, telephone number, and amounts and dates received;

(9) Copies of the minutes of meetings of the board of directors for the Church held since January 1, 1987, to and including the present;

(10) List of all members of Robert Tilton's family who are involved in any way with the production of Robert Tilton's television broadcasts;

(11) A copy of all policy or procedure manuals relating to the method and manner in which the Church, other Church entities, and Robert Tilton solicit contributions;

(12) A copy of every advertisement, brochure, or other document used in the promotion or marketing of the Church and all other Church entities.[9]

The scope and substance of these requests are clearly unconstitutional.[10] The State has no constitutional authority to know a person's membership in or support of any church. The State has no constitutional authority to know what a person believes, how he or she practices religion, or how he or she supports religious activities. Nor does the State have constitutional authority to probe into the internal operations of a church without limitation or compelling purpose. The First Amendment right to freedom of religious belief and freedom of association protects this kind of information.

Implicit in these First Amendment freedoms is privacy of belief and association. *See Buckley v. Valeo*, 424 U.S. 1, 65–67, 96

---

**9.** To avoid undue repetition, the Court has combined some of the Attorney General's specific requests in this list.

**10.** The scope of the request is also unreasonable and clearly oppressive insofar as it requires the Plaintiffs to produce an enormous amount of documents, which do not appear to have rele-

vance to the alleged purpose of the investigation. For example, the Church grosses approximately $65,000,000 a year. The number of checks received and mailed out and the documents produced, even over a three-year period, would be unimaginable, much less easily produced.

S.Ct. 612, 657, 46 L.Ed.2d 659 (1976); *Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 544, 83 S.Ct. 889, 892–93, 9 L.Ed.2d 929 (1962); *Bates v. City of Little Rock*, 361 U.S. at 523, 80 S.Ct. at 416; *N.A.A.C.P. v. Alabama*, 357 U.S. at 462, 78 S.Ct. at 1171–72. Disclosure of who belongs to a group or who contributes to a group, and how much, has been vigorously safeguarded by the United States Supreme Court. *See id.* The Court has recognized that disclosure to the public, or to the State, of a groups' members or contributors can harm the group by subjecting them to harassment or causing new members to not join for fear of disclosure or harassment or other reprisal. *E.g., Gibson*, 372 U.S. 539, 83 S.Ct. 889 (Florida legislative committee could not require Gibson to produce N.A.A.C.P.'s organization list for the committee).

The Attorney General argues that the church's First Amendment rights of free exercise of their religion and association are not harmed because the DTPA requires that the Attorney General not publicly disclose information gathered under Section 17.61 *See* Tex.Bus. & Com.Code Ann. § 17.-61(f). This argument is seriously flawed. Nothing prevents the Attorney General from disclosing information gathered under Section 17.60, and given past interpretations of statutes by the Attorney General,[11] it is not unforeseeable that the Attorney General might seize upon this distinction.

In addition, the mere threat of disclosure has been recognized as seriously harming a group by causing new members to not join and old members to withdraw in fear of hostility or reprisal. *Bates*, 361 U.S. at 524, 80 S.Ct. at 417; *Familias Unidas v. Briscoe*, 619 F.2d 391, 398, 400 (5th Cir. 1980). Thus, if the Attorney General is

permitted to make such a request and discloses the request, as done in this case, that in itself is a significant intrusion on the Plaintiffs' First Amendment rights. Such harm was shown in this case by the Plaintiffs, who testified that the number of new members joining the church has decreased and the number of old members withdrawing has increased. Death threats and other forms of harassment have also increased. This harms not only the Plaintiffs' rights of association but also the exercise of their religion, which to a large degree involves attracting new members to their faith and encouraging people to make "vows" to God.

Furthermore, Section 17.61(f) states that information gathered under that section may be used "in the enforcement of this subchapter, including presentation before any court." Given the publicity surrounding the hearings in this case so far, the Attorney General would be hard pressed to argue that information gathered will not be made public in the future.

Absent a compelling State interest, the Attorney General's "significant encroachment" upon "important and traditional aspects of individual freedom" cannot be tolerated. *See Bates* 361 U.S. at 524, 80 S.Ct. at 417; *N.A.A.C.P. v. Alabama*, 357 U.S. at 463, 78 S.Ct. at 1172; *Familias*, 619 F.2d at 399. The Attorney General's proffered reason for investigation is to determine if the Plaintiffs are persuading people to contribute to the Church through misrepresentations or fraud. Membership lists and contributors lists will not further that interest. Full and complete documentation of the Church's internal affairs may further that purpose, but such discretion is overbroad and if not more narrowly drawn cannot survive constitutional attack.[12] *Cf.*

**11.** Recall that the Attorney General interprets the Open Records Act exemption of information "deemed confidential by law" to mean that it is nonetheless permissible to release to the media document requests for information made confidential by the DTPA and the MCLA; describing in detail what the Attorney General is seeking. *See* Tex.Rev.Civ.Stat.Ann. Art. 6252–17a(3)(a)(1) (Vernon's 1992 Supp.); Tex.Bus. & Com.Code Ann. § 17.61(f); Tex.Rev.Civ.Stat.Ann. Art. 1302–5.04.

**12.** The Attorney General, during the hearings, tacitly admits both the January 13, 1992, document demand and requested relief in the *quo warranto* proceedings are unconstitutionally invasive and requested that amendments to both documents be allowed. The testimony of the Assistant Attorney Generals, in the hearings and in the proposed amended document request, however, remains consistent—they appropriately acted under their statutory authority in the DTPA. This "King's X" approach merely em-

*Int'l Soc'y for Krishna Consciousness v. City of Houston,* 689 F.2d 541, 556 (5th Cir.1982) (Houston ordinance, simply requiring registration for groups to solicit, did not require membership lists or lists of contributors or inquire about the organization's internal operations, apart from its public solicitation, and thus was constitutional).

Allowing the Plaintiffs to petition to modify or set aside the demand does not rectify the infringement on Plaintiffs' First Amendment rights. *See* Tex.Bus. & C. § 17.61(g); *see also Murdock,* 319 U.S. 105, 63 S.Ct. 870. Plaintiffs should not be forced to resort to the courts to be allowed to exercise their First Amendment rights. Section 17.61(g) of the DTPA requires just that in order for a person to challenge the Attorney General's document demand. Having to resort to the courts before exercising a First Amendment right is even more of an infringement than requiring fees to be paid first. *See id.* Section 17.-61(g) is not, contrary to the Attorney General's opinion, "adequate due process".

Furthermore, proceeding with the investigation under the DTPA, as interpreted by the Attorney General, would result in an excessive entanglement with the Church in violation of the Establishment Clause of the First Amendment.

During the hearing on injunctive relief before this Court, Assistant Attorney Generals testified that they were not trying to prevent the Plaintiffs from practicing their religion as they see fit or discourage membership in the church, but rather only wanted to investigate as to whether or not "secular statements" made in pamphlets and on television by Mr. Tilton were false or deceptive. For instance, if Mr. Tilton promised to pray over a prayer cloth, did he actually do so? However, the Assistant Attorney Generals fail to take the next logical step. If they apply the DTPA, and if they determine the church or Mr. Tilton have violated the DTPA, the relief granted

under the DTPA is injunctive. *See* Tex. Bus. & Com.Code Ann. § 17.47(a).

In order to withstand attack under the Establishment Clause, three requirements must be met:

First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971) (citations omitted); *see also United States v. Holmes,* 614 F.2d 985, 989 (5th Cir.1980).

While the Attorney General can easily show that the DTPA meets the first two requirements, the nature of the injunctive relief authorized by the DTPA in section 17.47 is such that the "end result" is "an excessive government entanglement with religion." *See Walz v. Tax Com'n of New York,* 397 U.S. 664, 674, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970); *Surinach v. Pesquera de Busquets,* 604 F.2d 73, 76 (1st Cir.1979). In *Surinach,* the First Circuit Court of Appeals found an investigation of operating costs of Catholic schools under a statute quite similar to the DTPA unconstitutional. *See Surinach,* 604 F.2d at 75. The statute was enacted to "defend and implement the rights of the consumer, to restrain inflationary trends; as well as the establishment and inspection of a price control over the goods and services for use and consumption." *Id.* at 74. The Secretary of the Department had "untrammelled" investigatory powers under which he could "require the information which might be necessary, pertinent and essential to achieve such purposes." *Id.*

Because the gathering of information was "not viewed as an end in itself", but merely as the first step in ultimately imposing ceilings on what the schools could spend, the Court found that if the end result was unconstitutional so was the investigation. *Id.* at 75. Examining the end

---

phasizes the unconstitutional application of the statute to a church, its ministers, and its members.

result, the Court determined that cost limits the Department might impose could seriously interfere with religious objectives and duties the school felt it owed its students. *Id.* at 77. In addition, imposition of cost controls would necessitate continuing surveillance by the Department which would also result in an impermissible degree of entanglement. *Id.* at 78 (citing *Walz*, 397 U.S. at 675, 90 S.Ct. at 1414).

Investigation of the Plaintiffs under the DTPA is equally impermissible under the First Amendment. Investigation of the Plaintiffs by the Attorney General under the DTPA is for the sole purpose of ascertaining whether or not the Plaintiffs have violated the DTPA. If the Attorney General determines that a violation exists, he may seek injunctive relief. *See* Tex.Bus. & Com.Code Ann. § 17.47(a). If injunctive relief is granted, the court retains jurisdiction, and the Attorney General may bring actions if the Plaintiffs do not comply, meaning of course that the Attorney General must monitor the Plaintiffs' activities to ensure compliance. *See id.* § 17.47(e). Plaintiffs' pamphlets, advertisements, television broadcasts, sermons, etc., would be subject to inspection and approval by the Attorney General. Certainly this continual monitoring of the Plaintiffs' activities by the Attorney General would constitute an excessive entanglement. *See Walz*, 397 U.S. at 675, 90 S.Ct. at 1414.

This would also require the Attorney General to make determinations as to which representations are purely religious and which are secular. The Assistant Attorney Generals assure this Court they can distinguish purely religious assertions from secular assertions subject to the DTPA. Despite the Assistant Attorney Generals' confidence, this Court does not believe they or any other state officials are authorized to make those kind of determinations. *See e.g., Cantwell v. Connecticut,* 310 U.S. 296, 305–06, 60 S.Ct. 900, 904, 84 L.Ed. 1213 (1940) (state could not give a state official the power to determine if a solicitation was for a religious cause or not in order for the solicitor to receive a license to solicit); *Lemon,* 403 U.S. at 618–19, 91 S.Ct. at 2114 ("With the best of intentions such a teacher would find it hard to make a total separation between secular teaching and religious doctrine"). It is simply not the business of courts or the State to "approve, classify, regulate, or in any manner control sermons delivered at religious meetings" or other forms of religious expressions. *See Fowler v. Rhode Island,* 345 U.S. 67, 70, 73 S.Ct. 526, 527, 97 L.Ed. 828 (1953).

The fact that the investigation may not reveal violations or that the Attorney General may not seek injunctive relief does not make the investigation constitutional. As stated in *Surinach,* "bifurcation of the gathering of the information and the purpose for which it is sought ... [is] both artificial and constitutionally unsound." *Id.* at 75. If there is no constitutional end use of the information gathered, there is no reason for this Court to wait until a constitutional violation has actually occurred. *See id.* at 75–76; *cf. Ambassador College v. Geotzke,* 675 F.2d 662, 664 (5th Cir.), *cert. denied* 459 U.S. 862, 103 S.Ct. 138, 74 L.Ed.2d 118 (1982). (Because an individual sought discovery, there was no danger of the *"government* seeking to monitor or regulate" a religious group, and therefore *Surinach* did not apply).

In sum, the express wording of the Texas Deceptive Trade Practices–Consumer Protection Act makes the Act inapplicable to the factual circumstances of this case and, even if applicable, the DTPA, as interpreted by the Attorney General and as used in this case, cannot be constitutionally applied to the Plaintiffs.

### TEXAS MISCELLANEOUS CORPORATION LAWS ACT

■ As previously mentioned, the Attorney General did not file a petition for enforcement in a Dallas district court under

Section 17.62(b) of the DTPA, but rather asserts his authority to investigate under the Texas Miscellaneous Corporation Laws Act ("MCLA").[14] The MCLA, as interpreted by the Attorney General, also cannot be constitutionally applied to the Plaintiffs in this case.

The Church is incorporated as a nonprofit corporation under the Texas Non-Profit Corporation Act. As such, Article 1302–1.03 of the MCLA causes the church to be governed by the MCLA "[e]xcept to the extent that any provisions of [the MCLA] are expressly made inapplicable by ... the Texas Non–Profit Corporation Act...."[15] *See* Tex.Rev.Civ.Stat. Art. 1302–1.03(B) (Vernon's 1992 Supp.).

Nonetheless, as interpreted by the Attorney General, the provisions of the MCLA may not be constitutionally applied to the Plaintiffs. Not only is the discretion of the Attorney General to investigate under the MCLA as broad and unbridled as it is under the DTPA, but the remedies provided under the MCLA and sought by the Attorney General would wholly deprive the Plaintiffs of their right to worship. *See generally* Tex.Rev.Civ.Stat.Ann. Art. 1302–5.01 *et seq.*

> Under Article 1302–5.01
>
> [e]very corporation ... doing business in Texas, shall permit the Attorney General ... to make examination of *all* the books, accounts, records, minutes, letters, memoranda, documents, checks, vouchers, telegrams, constitution and by-laws, and other records of said corporation *as he may deem necessary.*

*Id.* at Art. 1302–5.01(A) (emphasis added). Under Article 1302–5.03

> [t]he Attorney General ... has the power and authority to make investigation into the *organization, conduct and management* of any corporation ... authorized to do business within this State, and has authority to inspect and examine *any* of its said books, records, and other documents, and take such copies thereof as *in his judgment* may show *or tend to show* said corporation has been or is engaged in acts or conduct in violation of its charter rights and privileges, or in violation of any law of this State.

*Id.* at Art. 1302–5.03(A) (Vernon's 1992 Supp.) (emphasis added).

This is not just unbridled discretion, this is complete discretion. As these articles read, and as the Attorney General interprets them,[16] the Attorney General may inquire about, and inspect or investigate, literally any aspect of the Church. For the same First Amendment freedom of religion and association concerns described above with respect to the DTPA, this Court finds application of these articles to the Plaintiffs unconstitutional.[17]

The penalty section, under which the Attorney General sought various remedies in the Information *in quo warranto* filed on February 5, 1992, is even more egregious. Article 1302–5.05 states that

> A. Any ... domestic corporation which shall fail or refuse to permit the Attorney General ... to examine or take copies of *any* of its said books, records, and other documents ... *shall* thereby *for-*

14. The Office of the Attorney General was quite creative in their combining of statutes in the *quo warranto* proceeding. They seek to investigate possible violations of the DTPA. They assert their investigative power under the MCLA. And, they filed in Probate Court in Travis County pursuant to the Texas Probate Code.

15. Note that one of the remedies sought by the Attorney General in the original *quo warranto* proceeding, receivership under the MCLA, is expressly made inapplicable by Article 1396–7.07, which states that "[n]o receiver shall be appointed for any corporation in which this Act applies or for any of its assets or for its business *except* as provided for and on the conditions set forth *in this Act.*" *See* Tex.Rev.Civ.Stat.Ann. Art. 1396–7.07(A) (emphasis added).

16. Recall once again that even in the amended Document Request, the Consumer Protection Division maintains that it does not adopt the Plaintiffs' legal position in the matter, but rather modified the request merely "in an effort to respond" to the Plaintiffs' (and presumably this Court's) concerns.

17. And, for the same reasons described above with respect to the DTPA's nondisclosure provision, this Court finds Article 1302–5.04; which prohibits public disclosure of information gathered under the MCLA except "in a suit by the State ... or for information of any officer of this State charged with the enforcement of its laws", equally unprotective of the Plaintiffs' First Amendment rights.

*feit its right to do business* in this State; and its permit or charter shall be canceled or forfeited.

B. If any ... officer of any domestic ... corporation doing business under permit or charter from this State shall refuse to permit the Attorney General ... to make such examination ... or to take copies of *any* or all of the books, accounts, records, minutes, letters, memoranda, documents, checks, vouchers, telegrams, constitution and by-laws and other records of said corporation, he *shall* be *fined* not less than one hundred nor more than one thousand dollars, and be *imprisoned* in jail not less than thirty nor more than one hundred days. Each day of such failure or refusal shall be a separate offense.

Tex.Rev.Civ.Stat.Ann. Art. 1302–5.05 (Vernon's 1992 Supp.).

Proceeding under Article 1302–5.05 and Article 1302–5.10, the Attorney General sought "forfeiture of [the church's] charter and dissolution of the corporation and appointment of a Receiver to take possession of the affairs of the [church], to rehabilitate, reorganize, conserve or liquidate the affairs of the corporation" and sought a "Permanent Injunction against the [church], its officers, directors, stockholders, agents, employees, and representatives whomsoever from conducting any business of the [church]...." *See id.* Art. 1302–5.05, Art. 1302–5.10 (Vernon's 1992 Supp.). Application of these remedies to the Plaintiffs is clearly unconstitutional. It is absurd for the Attorney General to think that it can deprive the Plaintiffs of their rights to freely worship as a group altogether as punishment for the Plaintiffs' initial assertion of their First Amendment rights to not produce constitutionally protected documents. *See generally Murdock,* 319 U.S. 105, 63 S.Ct. 870; *Cantwell,* 310 U.S. 296, 60 S.Ct. 900.

Furthermore, although the Attorney General did not explicitly request fine or imprisonment under Article 1302–5.05, that article says refusal to produce requested documents "shall" result in forfeiture of

the corporations right to do business and its charter and "shall" result in a fine and imprisonment of the officer refusing to comply with the Attorney General's demand. *See* Tex.Rev.Civ.Stat.Ann. Art. 1302–5.05. Thus, it is not inconceivable that the Probate Court might also impose fines or imprison Mr. or Mrs. Tilton. If so, a fine for exercising one's First Amendment rights would clearly be unconstitutional under *Murdock v. Pennsylvania,* which did not even permit a fee to exercise First Amendment rights to spread one's religious beliefs. *See Murdock,* 319 U.S. at 115, 63 S.Ct. at 876. Imprisonment would also clearly be unconstitutional, both as a punishment for exercising one's constitutional rights and because it would wholly prevent Mr. or Mrs. Tilton from exercising an important part of their religious beliefs, which is to spread their religious faith to others. *See id.*

Finally, the MCLA does not even have a provision, as does the DTPA, allowing the Plaintiffs to bring an action to challenge the document demand. Having determined that forcing the Plaintiffs to seek a court order to permit them to exercise their constitutional rights is violative of those rights, giving them no means of redress is even more damaging.

The investigation and penalty provisions of the MCLA, as interpreted by the Attorney General, may not be constitutionally applied to the Church or to the Tiltons.

## CHARITABLE TRUSTS LAW

█ The Attorney General also maintains that the Church is a charitable trust and that, as such, it is the Attorney General's common law duty to protect the public's interest with respect to that charitable trust.[18] Without having to reach the Attorney General's duties over charitable trusts under the common law, this Court finds that the church is not a charitable trust.

A "charitable trust" as defined in the Texas Property Code includes a "charitable entity". Tex.Prop.Code Ann. § 123.001(2)

---

**18.** Only if the church is a charitable trust is filing in the Travis County Probate Court prop-

er. *See* Tex.Probate Code Ann. § 5A(c), (d), (e) (Vernon's 1992 Supp.).

(Vernon's 1992 Supp.). A "charitable entity", in turn, is defined as a "corporation, ... or other entity organized for scientific, educational, philanthropic, or environmental purposes, social welfare, the arts and humanities, or another *civic or public purpose* described by Section 501(c)(3) of the Internal Revenue Code of 1986...." *Id.* at § 123.001(1). The Attorney General argues that because Section 501(c)(3) of the Internal Revenue Code includes a corporation operated for religious purposes the Church is a charitable entity.

This Court disagrees. A church is not organized for a "civic or public purpose". If the Legislature had intended to incorporate any entity described in the Internal Revenue Code, whatever its purpose, it could have easily done so. The church is not a charitable trust, and because jurisdiction in the Travis County Probate Court is based on the church being a charitable trust, that jurisdiction is improper. *See* Tex.Probate Code Ann. § 5A (Vernon's 1992 Supp.).

## TEXAS NON–PROFIT CORPORATION ACT

■ This Court's finding that the DTPA and MCLA cannot be constitutionally applied to the Plaintiffs and that the *quo warranto* proceeding may not be properly maintained in the Travis County Probate Court does not mean that the Attorney General has no authority to investigate the Plaintiffs.

The Court agrees with the Attorney General that persons may not, "under the cloak of religion" use the First Amendment "with impunity" to "commit frauds upon the public". *See Cantwell*, 310 U.S. at 306, 60 S.Ct. at 904. Nonetheless, the Attorney General cannot, in turn, use allegations of fraud as a sword to violate the Plaintiffs' First Amendment rights either. Lines must be drawn and interests balanced. The DTPA and the MCLA, as interpreted by the Attorney General, are too broad and give too little protection and may not be constitutionally applied to the Plaintiffs. The Texas Non–Profit Corporation Act

("NPCA"), however, may be constitutionally applied.

Article 1396–2.01 of the NPCA states that a corporation organized under the NPCA "shall" fully state its purposes in its articles of incorporation. Tex.Rev.Civ.Stat. Ann. Art. 1396–2.01 (Vernon's Supp.1992). It also lists some permissible purposes, including charitable and religious. *See id.* The church is properly organized as a nonprofit corporation, and its articles of incorporation (Restated) properly list its purposes. The Attorney General has the right to test that—to determine if the church is indeed operating only within the scope of its stated purposes.

The Attorney General's authority stems from both the Texas Constitution and the Non–Profit Corporation Act. Article 4, section 22 of the Texas Constitution states that the Attorney General

> shall especially *inquire into the charter rights* of all private corporations, and from time to time, in the name of the State, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power ... not authorized by law. (emphasis added).

Article 1396–7.01 gives the Attorney General the authority to seek dissolution of a non-profit corporation "when it is established that ... [t]he corporation has continued to transact business beyond the scope of the purpose or purposes of the corporation as expressed in its articles of incorporation." Tex.Rev.Civ.Stat.Ann. Art. 1396–7.01(A)(3).

The Texas Constitution and the Non–Profit Corporation Act make it clear that the Attorney General does have the limited power under a "properly narrowed summons" to investigate in order to determine if the church is operating within the limited purposes for which it was incorporated and if it may retain its non-profit status. *See United States v. Grayson County State Bank*, 656 F.2d 1070, 1074 (5th Cir.1981); *United States v. Holmes*, 614 F.2d 985, 989 (5th Cir.1980) ("Requiring plaintiff to comply with a properly narrowed summons in order to show its entitlement to tax exempt

status results in only an incidental burden upon his free exercise of religion").

Furthermore, to the extent financial records actually kept by the church are necessary to make that determination, they may be inspected. That Article 1396–2.23A specifically exempts a religious institution from having to maintain, and make available to the public, financial records "with respect to all financial transactions of the corporation" does not mean records actually kept are necessarily exempt from inspection as well. Article 1396–2.23 requires all non-profit corporations to keep "correct and complete books and *records of account*" for inspection by any member. Tex.Rev.Civ.Stat.Ann. Art. 1396–2.23 (emphasis added). Thus, the church is not exempt from all record-keeping, but rather only in depth financial record-keeping. It would be ludicrous to find that the Attorney General has no authority to look at any financial records given his duties and powers under the Texas Constitution and the NPCA to insure that non-profit corporations are non-profit.

CONCLUSION

The Court holds that the Texas Deceptive Trade Practices–Consumer Protection Act and the Texas Miscellaneous Corporation Laws Act, as interpreted by the Attorney General, may not be constitutionally applied to the Word of Faith World Outreach Center, Incorporated, to Robert G. Tilton, or to Martha Tilton. The *quo warranto* proceeding in the Travis County Probate Court, Cause No. 59,268, is permanently enjoined. The Attorney General of Texas, is permanently enjoined from pursuing further its January 13, 1992, demand for documents and investigation pursuant to the DTPA and the MCLA, but this order is without prejudice to the Attorney General to *appropriately* pursue an investigation of the Plaintiffs under the Texas Non-Profit Corporation Act.