**WORD OF FAITH WORLD OUTREACH CENTER CHURCH, INC., a Church non-profit Texas corporation, Robert G. Tilton and Martha Phillips Tilton, Plaintiffs,**

**v.**

**Dan MORALES, in his official capacity as Attorney General of the State of Texas, Defendant.**

**Civ. No. A–92–CA–89.**

United States District Court, W.D. Texas, Austin Division.

June 23, 1992.

**3.** *Kirshner v. Uniden Corp.,* 842 F.2d 1074, 1080 (9th Cir.1988).

Diane M. Henson, Graves, Dougherty, Hearon & Moody, Austin, Tex., J.C. Joyce, Joyce & Pollard, Tulsa, Okl., for plaintiffs.

Rose Ann Reeser, Texas Atty. General's Office, Charitable Trust Section, David Guillory, Atty. General's Office, General Litigation Div., Joe K. Crews, Office of Atty. Gen., Consumer Protection Div., Austin, Tex., for defendant.

SPARKS, District Judge.

## MEMORANDUM OPINION AND ORDER

On May 22, 1992, Plaintiffs filed a Motion for Sanctions against the Defendant, Dan Morales, Attorney General of the State of Texas. According to the Plaintiffs, the Attorney General released to the media a videotaped deposition of Robert G. Tilton in contravention of an express agreement made at the deposition that the videotape deposition would not be released to the media.

On June 12, 1992, with the parties' counsel and Dan Morales present, this Court held a hearing on the motion. At that hearing, the Attorney General and his counsel denied that any of the Attorney General's conduct is sanctionable. Having reviewed the pleadings and supporting affidavits, and listened to counsel's arguments and Dan Morales' statements in court, however, this Court finds that the Attorney General's deliberate breach of an agreement, made by the Attorney General's own lawyers to obviate the need to seek a protective order under Federal Rule of Civil Procedure 26, by releasing Robert Tilton's

videotape to television stations and newspapers without notice to Plaintiffs' counsel based upon the Attorney General's own interpretation of the Open Records Act, and then affirming his conduct by stating that were similar circumstances to arise in the future, he would act no differently is most certainly sanctionable conduct and publicly sanctions Dan Morales, the Attorney General of Texas.

## BACKGROUND

The litigation between the parties in this case has been anything but friendly or agreeable. During the relatively short duration of the case at the trial level, the parties fought with great intensity and increasing bitterness. Unflattering media coverage of Word of Faith World Outreach Center Church, Incorporated and its minister, Robert G. Tilton, has been a part of this suit even before its inception, beginning with ABC's Prime Time Live segment, which triggered the Attorney General's investigation and ultimately this lawsuit. Without going into greater detail, some of which may be found in this Court's earlier opinion at 787 F.Supp. 689, there can be no doubt that anyone at all involved in this lawsuit was aware of the Plaintiffs' concern with information being released to, and in the Plaintiffs' opinion misconstrued by, the media.

On February 22, 1992, counsel for the Attorney General took a videotape deposition of Robert Tilton, which had been ordered by the Court, at the Dallas—Fort Worth Airport. *Prior* to the taking of the deposition, counsel for the Plaintiffs, Diane Henson, and counsel for the Attorney General, Rose Ann Reeser, apparently entered into an agreement concerning release of the videotape deposition to the media. At the close of the deposition, Ms. Henson confirmed, on the record, the existence of the agreement with Ms. Reeser:

Ms. Henson: I think counsel for the Attorney General represented at the beginning of this deposition that they were not going to release the video depositions to the press, and the only use that these would be made of is if at trial they needed to be used. Is that correct, Counsel?

Ms. Reeser: Yes, I did represent that we would not release them to the press.

Video Deposition of Robert G. Tilton, at 189 (February 22, 1992). As a result of this specific agreement, counsel for the Plaintiffs did not seek a protective order against the release of the videotape which, under the circumstances, this Court would have granted.

On April 15, 1992, the Opinion Committee of the Office of the Attorney General received a letter from the Dallas Morning News requesting copies of "all transcripts and or video tapes of the [February 22, 1992] deposition of Robert and or Marte Tilton". On April 23, 1992, Rose Ann Reeser sent a memorandum to Madeline Johnson, Chair of the Opinion Committee, informing Ms. Johnson that she had told Robert Tilton that she "did not intend to release [the deposition] to the press" and that she "affirmed that statement on the record." Despite knowledge of the agreement, on May 11, 1992, Ms. Johnson sent a letter to the Dallas Morning News informing them that "none of the information contained in the depositions comes under the protection of the common law right of privacy or any other exceptions to required public disclosure as provided in section 3(a) of the Texas Open Record Act, V.T.C.S. art. 6252–17(a)," and therefore the paper could obtain transcripts of the depositions. Finally, on May 15, 1992, without prior notice to the Plaintiffs, the first of several news broadcasts showing excerpts of the February 22, 1992, deposition of Robert Tilton appeared on Channel 8 in Dallas, Texas. Again, the newscasts portrayed a quite unflattering picture of both Robert Tilton and Word of Faith, which, according to the Plaintiffs, caused them serious harm.

## SANCTIONS

With that preamble, it comes as no surprise that on May 22, 1992, the Plaintiffs filed a motion for sanctions.

In the Attorney General's response to the motion, he emphasizes that Ms. Reeser

did not act in bad faith when she represented that the deposition would not be released to the media. The Court agrees. However, that does not vitiate the behavior of the Attorney General in taking advantage of Ms. Reeser's good faith agreement and releasing the videotape to the media despite the agreement and without giving the Plaintiffs notice and an opportunity to seek a protective order, which they otherwise had no reason to believe they needed. In his response and in court, the Attorney General and his counsel maintained that the information in the deposition did not warrant protection under the Open Records Act, despite the fact that but for the agreement and the lack of notice, Plaintiffs would have sought and received a protective order from this Court under Rule 26. Finally, in the response, the Attorney General argued that this Court no longer has jurisdiction because the case has been appealed.

Whether the Attorney General acted in bad faith by allowing the videotape deposition of Robert Tilton to be released in violation of the agreement and without prior notice to the Plaintiffs is the key issue in this matter. Nonetheless, the Court will first address some of the preliminary issues raised by the Attorney General.

## A. *Jurisdiction*

■ The Attorney General argues this Court does not have jurisdiction because the case has been appealed to the Fifth Circuit Court of Appeals. In support, he cites *United States v. Hitchmon*, 602 F.2d 689 (5th Cir.1979), which states "[t]he filing of a timely and sufficient notice of appeal transfers jurisdiction *over matters involved in the appeal* from the district court to the court of appeals." *Id.* at 692 (emphasis added).

■ This is not a "matter involved in the appeal" of this case to the Fifth Circuit. Furthermore, this Court has continuing jurisdiction to enforce the injunctions it issued. *Waffenschmidt v. Mackay*, 763 F.2d 711, 716 (5th Cir.1985), *cert. denied*, 474 U.S. 1056, 106 S.Ct. 794, 88 L.Ed.2d 771 (1986). While the requested sanctions are not for violation of an injunction, they do concern proceedings before this Court. As such, the determination of sanctions based on the Attorney General's alleged abuse of the discovery process is properly before this Court as a question ancillary to the primary injunctive cause of action over which it maintains jurisdiction. *See Jackson Marine Corp. v. Harvey Barge Repair, Inc.*, 794 F.2d 989, 991 (5th Cir.1986). Furthermore, since this Court is permitted to consider the issues of attorneys' fees and Rule 11 sanctions after entering judgment, it should certainly be able to also consider sanctions based on its inherent power to sanction despite the pending appeal. *See id.* Just as determination of the award for attorneys' fees incurred in the underlying action does not interfere with the Court of Appeals' jurisdiction over the matters raised on appeal, neither does consideration of sanctions for conduct ancillary to the underlying action.

## B. *Protective Order*

■ The Attorney General also argues that even if the Plaintiffs had sought a protective order, "such protection would not have been properly available to them." Defendant's Response to the Plaintiffs' Motion for Sanctions, at 8. In support, the Attorney General asserts that there was no information in the depositions which would have been protectable under Federal Rule of Civil Procedure 26(c). Defendant's Response, at 8 (citing *Seattle Times v. Rhinehart*, 467 U.S. 20, 34–36, 104 S.Ct. 2199, 2208–09, 81 L.Ed.2d 17 (1984)).

The Attorney General is wrong. Not only would this Court have issued a protective order, but Rule 26 and the Supreme Court case of *Seattle Times v. Rhinehart* both support a finding that this Court had full authority to do so. Rule 26(c) states, in part, "[t]he court ... may make *any* order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." Fed.R.Civ.P. 26(c) (emphasis added). There is no question that the Tiltons were subjected to annoyance and embarrassment, and allegedly further harass-

ment and reduction in the membership of the church, as a result of the release of the February 22, 1992, videotape deposition. Furthermore, in light of the fact that Mr. Tilton would either testify at trial or allow the deposition to be used at trial, causing his testimony to then become public in either case, prohibiting release of the videotape would not have harmed the public or the Attorney General, except, perhaps by depriving the Attorney General of another television appearance.

As pointed out by the Supreme Court in *Seattle Times v. Rhinehart*,[1] "pretrial depositions ... are not public components of a civil trial," and restraining the dissemination gathered therein does not require "exacting First Amendment scrutiny." *Id.* at 33, 104 S.Ct. at 2207–08. "Rule 26(c) furthers a substantial governmental interest unrelated to the suppression of expression." *Id.* at 34, 104 S.Ct. at 2208. It protects persons from abuse of pretrial discovery. *Id.* Under the law of procedure, parties and related persons often have no choice but to divulge information they would not otherwise freely share. To allow a party to use that information for purposes unrelated to the litigation and in a manner which harms the giver of that information is abusive, and courts have a significant interest in preventing such usage. *See generally id.* at 33–36, 104 S.Ct. at 2208–09.

Given the potential harm, which has now occurred, and the limited scope of protection which would have been granted, this Court would certainly have acted within its legal authority by issuing a protective order prohibiting release of Mr. Tilton's videotape deposition to the media and limiting use of the tape to legitimate litigation purposes.

## C. *Open Records Act*

 Article 6252–17a § 3(a) of the Texas Open Records Act makes "[a]ll information collected, assembled, or maintained by or for the governmental bodies ... public in-

formation and available to the public during normal business hours of any governmental body, with the following exceptions only...." Tex.Rev.Civ.Stat. art. 6252–17a § 3(a) (Vernon's 1992 Supp.). The three exceptions relevant to this case are "(1) information deemed confidential by law, either Constitutional, statutory, or by judicial decision; ... (3) information relating to litigation of a criminal or civil nature and settlement negotiations, to which the state or political subdivision is, or may be, a party, ... that the attorney general or the respective attorneys of the various political subdivisions has determined should be withheld from public inspection; ... [and] (7) matters ... which by order of a court are prohibited from disclosure." *Id.*

If the Plaintiffs had sought a protective order and this Court had granted it, the videotape deposition would not be public information subject to the Open Records Act under Article 6252–17a § 3(a)(1) and/or (7). However, since the Plaintiffs did not, because of the agreement, the third exception is more directly applicable here. From the plain language of the Act, any reasonably intelligent person would believe section (3)(a)(3) applies in this case since the Attorney General, through his attorney and agent Rose Ann Reeser, apparently determined that the videotape deposition "should be withheld from public inspection" when he agreed the tape would not be released to the media and would be used only at trial if necessary. *See e.g.,* Open Rec.Dec. No. 280 (1981). The information in Robert Tilton's videotape deposition is certainly related to the underlying litigation in this case, as well as litigation the State "may be" a party to in the future based upon its continued investigation of Robert Tilton and Word of Faith to determine if civil or criminal liability exists.

In a situation very similar to this one, a previous Attorney General reached the same decision this Court did. A third party requested information from the Texas Vet-

---

**1.** Although in that case the district court below had only issued a protective order preventing dissemination of membership lists or financial information, the Supreme Court's opinion more generally addresses the issue of restraining dissemination of information obtained through the discovery process. *See Seattle Times,* 467 U.S. at 33–37, 104 S.Ct. at 2207–09.

erinary Medical Diagnostic Laboratory ("TVMDL"), whose director was being represented by the Office of the Attorney General in a lawsuit. In resolving whether or not section 3(a)(3) of the Open Records Act applied, the Attorney General stated:

> In this case, an officer of the TVMDL, a state agency, is already a party to civil litigation as a consequence of his office. The assistant attorney general handling this case has determined that the requested information 'should be withheld from public inspection.' In our opinion, such determination, coupled with the existence of pending litigation which is clearly related to the requested information, *clearly invokes the protection of section 3(a)(3)*.

Open Rec.Dec. No. 280 (1981) (emphasis added).

During arguments before this Court, counsel for the Attorney General cited Open Records Decision 551 for the proposition that the purpose of section 3(a)(3) is to prevent an *opposing party* from obtaining information through the Open Records Act instead of the normal discovery process. *See* Open Rec.Dec. 551, at 3 (1990); *see also* Open Rec.Dec. No. 511 (1988). If so, Ms. Reeser certainly was not compelled to agree to confidentiality. Nonetheless, she did.

In Open Records Decision 511, the Attorney General stated that an assistant attorney general's initial determination under section 3(a)(3) "is subject to review by the division of the attorney general's office that administers the Open Records Act." Open Rec.Dec. 511, at 2 (1988). While that decision involved an assistant attorney general representing a state agency other than the Office of the Attorney General itself, review under section 3(a)(7) may also have been appropriate in this case. It does not, however, answer the question in this case

of the appropriateness of the Attorney General's decision, upon review, to release the videotape contrary to the express agreement of confidentiality.

In at least one case, the Attorney General has found an express promise of confidentiality causes the "protected" information to be exempt from the Open Records Act. *Ind. Found., Etc. v. Texas Ind. Accident Bd.*, 540 S.W.2d 668, 677 n. 15 (Tex. 1976), *cert. denied* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977) (citing Open Rec.Dec. No. 55A (1975)) (the Court distinguished that Attorney General opinion from the case before it in which the individual furnishing information to a state agency, before the effective date of the Open Records Act, did so with "the expectation [but not promise] that access to the information would be restricted"). Any practicing lawyer would have, and should have, relied upon Ms. Reeser's good faith representation and section 3(a)(3) when determining that no protective order was necessary to prevent release of the videotape under the Open Records Act. However, even if in this case the Attorney General truly was bound to release the videotape deposition of Robert Tilton to the press, in violation of the agreement made by assistant attorney general Rose Ann Reeser, such a determination, which this Court need not and will not make,[2] still does not dispose of the sanctions issue in this case.

### D. *Inherent Power of the Court to Sanction Bad Faith Conduct*

This Court has the inherent power to issue sanctions when a party or attorney acts in bad faith. *Chambers v. Nasco, Inc.*, — U.S. —, 111 S.Ct. 2123, 2132–33, 2135, 2136, 115 L.Ed.2d 27 (1991); *United States of America v. Wallace*, 964 F.2d 1214, 1218 (D.C.Cir.1992); *Matter of Case*,

---

**2.** Nonetheless, the Court cannot help but note that allowing the Attorney General to make an agreement of confidentiality with a party, through an assistant attorney general, and then breach that agreement, through a division of the Office of the Attorney General, in a case where the party has sued the Attorney General, not some other state agency, appears to be a classic case of "the fox guarding the henhouse." If the

Attorney General is too busy to ever be personally involved in litigation where he is a party, and he is not bound by determinations made by his attorneys or can change his mind at his pleasure, it seems application of this exception can be easily abused. If Ms. Reeser was wrong in agreeing to the deposition's confidentiality, the Plaintiffs should not bear the burden of her alleged mistake.

937 F.2d 1014, 1023 (5th Cir.1991). "A federal district court must be able 'to protect the administration of justice by levying sanctions in response to abusive litigation practices.'" *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir.1985), *cert. denied sub nom. United Fund, Ltd. v. Brockton Savings Bank*, 475 U.S. 1018, 106 S.Ct. 1204, 89 L.Ed.2d 317 (1986) (quoting *Penthouse Int'l, Ltd. v. Playboy Enterprises, Inc.*, 663 F.2d 371, 386 (2d Cir.1981)). However, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion ... [a] primary aspect of [which] is the ability to fashion an appropriate sanction...." *Chambers,* — U.S. at ——, 111 S.Ct. at 2132–33.

Thus, there are two primary considerations: did the attorney general act in bad faith, and, if so, what is an appropriate sanction?

### 1. *Standard for Finding Bad Faith*

There are no set rules for finding "bad faith." The foremost case on a court's inherent power to sanction is the 1991 Supreme Court case, *Chambers v. Nasco, Inc.* In that case, the Supreme Court noted that the sanctioned party's "conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court...." *Chambers,* — U.S. at ——, 111 S.Ct. at 2136. More specifically, Chambers tried to put property out of reach of the district court after being notified that a temporary restraining order would be sought to prevent Chambers from transferring or putting an encumbrance on the property; he ignored repeated warnings from the trial judge about his misconduct; he filed false and frivolous pleadings; and he generally engaged in "tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance." *Id.* at ——. 111 S.Ct. at 2128–31. As a sanction, the district court made Chambers pay all of the plaintiff's litiga-

tion costs, which totalled $996,644.45. *Id.* at ——, 111 S.Ct. at 2130.

Obviously, the conduct here is not as egregious, at least not in the immediate suit between Plaintiffs and the Attorney General.[3] However, the Court nowhere says that this level of bad faith is necessary before sanctions may be awarded. In fact, its statement that "all of [the] litigant's conduct is deemed sanctionable," implies that the court could have issued sanctions, perhaps less harsh, for each "discrete occurrence[ ]" of bad faith conduct. *See id.* at ——, 111 S.Ct. at 2136.

In *Matter of Case*, the Fifth Circuit upheld sanctions against a debtor and his attorney issued by a bankruptcy judge under his inherent authority. *Matter of Case*, 937 F.2d 1014, 1022–23 (5th Cir.1991). The debtor, Case, had failed to make payments under a settlement agreement and when his estate was reopened by the bankruptcy court, raised a false claim "solely for the improper purpose of delaying the bank's collection on the note." *Id.* at 1017.

In *Lubrizol Corp. v. Exxon Corp.*, the Fifth Circuit upheld sanctions issued by a district court for Lubrizol's failure to comply with a court order to submit an affidavit setting forth its position with respect to Exxon's litigation expenses. *Lubrizol Corp. v. Exxon Corp.*, 957 F.2d 1302, 1307 (5th Cir.1992). The sanction consisted of accepting Exxon's affidavits, establishing $2,424,462.04 in litigation expenses, as uncontradicted. *Id.*

These Fifth Circuit opinions make it clear that despite a court's need to act cautiously, bad faith need not be extraordinary to qualify for very severe sanctions.

*Lubrizol* is especially noteworthy because if the Plaintiffs had known the agreement would not be honored, they would have sought and received a protective order from this Court, which not only would have made the deposition not subject to the Open Records Act under section 3(a)(1) and/or 3(a)(7), but if the Attorney General had subsequently disobeyed that

---

**3.** I.e., if the Attorney General routinely makes and breaks agreements with litigants, his conduct may in the long run be as, or more, egregious.

protective order, under *Lubrizol* sanctions would have been warranted. *Id.* at 1307; *see also Seattle Times*, 467 U.S. at 34–35, 104 S.Ct. at 2208–09 (there is a significant potential for abuse of pretrial discovery, which courts have a substantial interest in preventing). Thus, there is potentially even greater reason to sanction the Attorney General in this case because the Plaintiffs were initially led to believe no protective order was necessary and given no opportunity to seek one when it became necessary.

## 2. Analysis

There is no question Rose Ann Reeser acted in good faith when she agreed to not release the videotape deposition of Robert Tilton. Ms. Reeser's affidavit and memorandum to the Chair of the Opinion Committee reveal nothing but her honest and sincere intention to honor her agreement with the Plaintiffs.

The Attorney General, on the other hand, did act in bad faith. In his affidavit [4], the Attorney General states that he has "closely monitored" this case and has been aware since early May of 1992 of Ms. Reeser's "exchange with Mr. Tilton" and the "short on-the-record colloquy", although he interpreted that "exchange" as only meaning that Ms. Reeser never intended to release the videotape "without any formal request from the public." Nonetheless, he states that "[c]onsultation with [his] staff ... made it clear to [him] that the depositions were open records under the Open Records Act" and further that [c]onsultation with Ms. Reeser and other members of [his] staff ... made [him] aware that *there was no protective order* (or any other judicial order, for that matter) limiting in any way the release of the videotape depositions *and* that, indeed, *no such order had ever been sought* by the Tiltons' attorneys. Affidavit of Dan Morales, Attorney General

of Texas (June 2, 1992) (emphasis added). Thus, he states he "approved the issuance of a letter ... informing the members of the press ... that the release would occur because the Open Records Act required it." Finally, he states:

> My view then, and my view now, is that the release was required by state law duties imposed on me, *was not prohibited by any judicial order*, was not contrary to any understandings reached between Ms. Reeser and counsel for the Tiltons, and even if it was contrary to any agreement as understood by counsel for the Tiltons, was nonetheless required by state law and not prohibited by federal law.

*Id.* (emphasis added).

During the June 12, 1992 hearing, this judge asked the Attorney General to respond to his biggest concern—the Attorney General's indication in his affidavit that, although he knew of the agreement to not release the deposition, he decided to do so anyway because there was no protective order, despite the fact that everyone knows there was no protective order in this case because Ms. Reeser agreed with the Plaintiffs the tape would not be released. The Attorney General at first evaded the question and instead emphasized, as had his attorney, that no lawyer, not even an assistant attorney general, can override the Open Records Act.[5] Then, after repeating the question, the Attorney General stated that

> were similar circumstances to arise in the future—that is perhaps in another piece of litigation that Assistant Attorneys General indicate on the record that they will not release a particular document involved in litigation and it is later found by our opinions committee that the document is public, then I will feel compelled,

---

**4.** This affidavit was attached to the Attorney General's Motion for Reconsideration of Court Order of May 26, 1992, which challenged this Court's order requiring Dan Morales to appear in person at the June 12, 1992, Sanctions hearing. The motion and subsequent petition for writ of mandamus filed with the Fifth Circuit Court of Appeals were both denied.

**5.** Although this judge told the parties on the record, more than once, that neither he nor any party or lawyer has challenged the validity or importance of the Texas Open Records Act, the Court reemphasizes that point.

Your Honor, to make the same decision in that case as I have made in this case. Transcript of June 12, 1992 Motions Hearing, at 47. However, if a court order preventing the release existed, he suspects a different conclusion would have been reached. Finally, the Court rephrased the question, for the fourth time, and was answered as follows:

THE COURT: ...

So you determined that your committee's decision to release the videotape because no exemption, including no protective order, had been entered by any Court was valid, and released it when you knew that the lawyers in your office had entered into an agreement that it would not be released so that no motion for protective order would be filed. Is that what you are telling me?

MR. MORALES: That is correct, Your Honor.

Transcript of June 12, 1992 Motions Hearing, at 50.

The Attorney General effectively denied Plaintiffs of their substantive and procedural right to seek a protective order under Rule 26 twice in this case. This Court has repeatedly asked litigants, including the Plaintiffs and the Attorney General, to resolve discovery disputes on their own, if possible. In the words of a past attorney general of Texas, "[t]he litigation exception [section 3(a)(3)] was intended to prevent the use of the Open Records Act as a method to avoid discovery rules" and allow courts to properly resolve disputes, which they are in "the best position to resolve." Open Rec.Dec. 551 (1990) (citing Op. Att'y Gen. JM-1048 (1989)). The Attorney General has defeated both of those purposes. He intentionally breached his own agreement, which had apparently obviated the need for Plaintiffs to come to this Court to receive a protective order, failed to allow this Court to consider the need for a protective order by not giving notice to the Plaintiffs of his intent to breach, and now hides behind that lack of a protective order to justify breaching that agreement.

As for his failure to notify the Plaintiffs that he intended to breach the agreement, the Attorney General offered no explanation, other than to say he "regrett[ed] the fact [such a] courtesy was not extended." Transcript of June 12, 1992 Motions Hearing, at 47. Twenty-six days elapsed between the day the Open Records request was made and the day the Attorney General released to the press Robert Tilton's videotape deposition. Notice to the Plaintiffs on any one of those twenty-six days would have given them an opportunity to obtain a protective order. The Attorney General has not only used the Open Records Act to avoid discovery rules, he has abused those discovery rules and undermined this Court's attempt to encourage lawyers to behave as responsible adults and conserve judicial resources by resolving their own discovery disputes.

Counsel for the Attorney General asks this Court to take note of the Office of the Attorney General's generally good reputation for integrity and ignore this one lapse. The Court cannot do that. The Attorney General, the highest public official elected to represent the citizens of Texas,[6] intentionally and deliberately acted wrongly. The parties and lawyers in this case have agreed on very little in this case and have especially vigorously debated the propriety and cause of the substantial press coverage the case has received. Of all cases this

---

**6.** State Bar Rule 8.04 states that a lawyer "shall not ... engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Tex.Gov't Code, State Bar Rule 8.04(3) (Vernon's 1992 Supp.). According to comment 7 to that rule, the Attorney General, as a lawyer holding public office, "assume[s] legal responsibilities going *beyond those of other citizens*" and his "abuse of public office can suggest an inability to fulfill the professional role of attorney." Tex.Gov't Code, State Bar Rule 8.04, Comment 7 (emphasis added). Furthermore, Local Rule AT-4 states that all attorneys permitted to practice in the Western District must be familiar with the State Bar Rules of Professional Conduct and "shall not engage in any conduct which degrades or impugns the integrity of the Court or in any manner interferes with the administration of justice therein." Local Court Rules for the United States District Court of the Western District of Texas (1990). The Attorney General has impugned the integrity of the Court and abused his public office.

Court has seen, this one most required the parties to stand by an agreement such as the one made and breached in this case.

## CONCLUSION

The Court finds that the Attorney General's release of the videotape deposition of Robert Tilton to the media, without prior notice to either the Plaintiffs or their counsel, was a deliberate and intentional breach of the express agreement made in good faith by his own lawyers and made for the purpose of eliminating the need to file a motion for protective order. The Court further finds that the Attorney General's justification for releasing the videotape—that there was no Court order preventing the release—constituted unprofessional and unjustifiable action, especially under circumstances when it should have been clear a protective order would have issued on request, creating an exemption from release under the Texas Open Records Act, the very statute that Mr. Morales testifies mandated him to release the videotape to the media.

The Attorney General has not only put into question his integrity and the word of every assistant attorney general, but he, the highest legal officer of the state, has threatened the smooth functioning of this state's legal system by not honoring his lawyers' agreements.

Plaintiffs' counsel was correct when she said there are only two ways to govern discovery disputes: by agreement and by Court order. Now, according to Mr. Morales' testimony in court, in suits where the Attorney General is involved as a party or lawyer, wise litigants will be left with only one method of resolving discovery disputes.

The Court GRANTS the motion for sanctions against Dan Morales, Attorney General of the State of Texas, but will not assess damages which would have to be paid by the taxpayers of the State of Texas. Instead the Court SANCTIONS the Defendant Dan Morales by this public reprimand that by his conduct in this case he has dishonored his lawyers, his office, his profession, the courts, and the citizens of the State of Texas, whom he was elected to represent.

The Court FURTHER ORDERS that for one year whenever an assistant attorney general, representing any governmental body, wishes to make an agreement with an adverse party, or his or her counsel, in a suit before the United States District Court, Western District, Austin Division, the agreement must be signed personally by Dan Morales as well as the assistant attorney general initiating the agreement.